IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA


UNITED STATES OF AMERICA,

   Plaintiff,

v.             CRIMINAL ACTION NO. 1:12CR100

PATRICK FRANKLIN ANDREWS (1),
and
KEVIN MARQUETTE BELLINGER (2),,

   Defendants.


## MEMORANDUM OPINION, REPORT AND RECOMMENDATION

### I.
### Relevant General Procedural History

Defendant, Patrick Franklin Andrews [Andrews], stands indicted for murder (18 U.S.C. §§1111 & 1118). Notice of Intent to Seek the Death Penalty was filed and served pursuant to 18 U.S.C. §3593 [DE 46].

Count One of the Indictment charges that "[o]n or about October 7, 2007, in Preston County, within the Northern District of West Virginia, PATRICK FRANKLIN ANDREWS and KEVIN MARQUETTE BELLINGER, the defendants herein, while confined in a Federal correctional institution, namely the United States Penitentiary at Hazelton, West Virginia, while each was under a sentence for a term of life imprisonment, aided and abetted by each other, did unlawfully kill Jesse Harris with malice aforethought, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in violation of Title 18, United States Code, Section 1118 and Section 2."

The grand jury returned "Notice Of Special Findings" with respect to Count One, which

mirrored the United States' Notice Of Intent To Seek The Death Penalty As To Defendant Patrick Franklin Andrews [Notice] [DE 46]. Of particular note are paragraphs (g), (h) and (i) of the Notice within the Count One of the indictment.[1] The government contends these convictions, if proved, are aggravating circumstances which justify imposition of the death penalty should defendant be convicted of the substantive offense charged in Count One. 18 USC §3592 (c)(2), (3) and (4).

Pursuant to the order of the District Judge, the case was designated "complex" [DE 68]. By Pretrial and Trial Scheduling Order, dated December 21, 2012, trial was scheduled to commence with jury selection on June 9, 2014. [DE 71].

On October 7, 2013, death-qualified counsel filed Motion to Suppress Statements [DE 140], Motion to Suppress Seizure of Blood, Saliva & Hair [DE 141], Motion to Compel Mandated Discovery & Brady Material [DE 142], Motion To Suppress Search of Person [DE 143]. The motions were referred to the undersigned by the District Judge by Orders dated October 8, 2013 [DE 147], November 1, 2013 [DE 169], and November 27, 2012 [DE 61].

On October 28, 2013 the United States filed its Response ... To Motion To Suppress Statements [DE 165].

On November 8, 2013 came the Defendant Andrews in person and by his counsel, Harry J. Trainor, Jr., and Stephen D. Herndon, and the United States by AUSA Brandon Flowers and Richard

---

[1] "(g) has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person (18 U.S.C. Section 3592(c)(2)); (h) has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute (18 U.S.C. Section 3592(c)(3)); (i) has previously been convicted of two or more Federal or State offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. Section 3592(c)(4))."

Burns for hearing on the motions.

## II.

## Motion to Suppress Statements [DE 140]

A. Relevant Factual Outline:

Based on the hearing testimony and the exhibits attached to the response of the United States, the undersigned finds the following relevant facts:

1. October 7, 2007 inmate Jesse Harris, an inmate at the Hazelton prison, was stabbed to death.

2. Prison staff observed inmate Bellinger attacking Harris.

3. Prison staff chased inmate Bellinger.

4. Bellinger was apprehended by prison staff in the yellow corridor of the prison.

5. Pursuant to prison policy, after the attack on and death of Jesse Harris, prison officials conducted an investigation. The prison investigation was conducted using prison staff supervised by SIS (special investigative services) and the FBI. The investigation took three general procedural routes: 1) use of prison staff to interview each of the 1,200 inmates at the prison for approximately 10 minutes whether they had anything to say or not; 2) securing selected video from the prison video surveillance system; and 3) SIS and FBI interrogation of Andrews.

6. Staff later reviewed prison surveillance video and identified inmate Andrews as a second assailant of Harris.

7. Prison Staff went to the B-2 housing unit where Andrews lived and took him in to

custody at his cell.

8. FBI Special Agent James Watson was called to the prison on October 7, 2007 in response to the homicide of Jesse Harris.

9. Watson interviewed Andrews.

   a. Watson advised Andrews of his Miranda rights.

   b. Andrews stated: "he had no idea what the Agents were talking about and he did not wish to make a statement." [DE 165, Ex. 1].

   c. The interview with Andrews was terminated.

10. Registered Nurse David McRobie of the USP Hazelton Prison medical staff :

    a. treated Jesse Harris at the scene of the stabbing and at the health services area;

    b. was asked by prison staff to do a medical assessment on two inmates in accord with standard operating procedure at the prison to do medical assessment on inmates who may have been injured;

    c. did not know and was not advised why he was doing a medical assessment on Andrews or Bellinger;

    d. no prison investigator was present during the medical assessments of Andrews or Bellinger;

    e. performed medical assessments of Andrews and Bellinger;

    f. looked at and under Andrews' fingernails for injuries;

    g. used a form provided by the prison to do the medical assessments;

    h. asked Andrews if he had any injuries and how they occurred;

|    | I.  | reported Andrews to have said: "I don't know anything." [DE 165, Ex. 2]; and |
|----|-----|---|

|    | j.  | did not observe any signs of injury to Andrews and "medically cleared [Andrews] for placement in SHU" at approximately 2230 hours on October 7, 2007. [DE 165, Ex. 2]. |
|----|-----|---|

B.  Issues Presented

1. Did Andrews make statements?

2. Were any statements of Andrews made while he was in custody ?

3. Was Andrews Mirandized?

C.  Discussion

The Self-Incrimination Clause of the Fifth Amendment guarantees that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Constitution, amendment V.

Accordingly, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 444 (1966). Those procedural safeguards require an officer prior to engaging in custodial interrogation to warn "the person ... that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

In the absence of such warning, any statement a defendant may make will not be admissible in a subsequent trial. *See Id.* ("[U]nless and until such warnings ... are demonstrated by the

prosecution at trial, no evidence obtained as a result of interrogation can be used[.]").

A person is "in custody" when, under the circumstances surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)).

The "custody" inquiry focuses on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994)(per curiam). Even if the officer discloses to the interrogated person his views "concerning the nature of the interrogation...[or] the potential culpability of the individual being questioned," such views are relevant to the custody determination only to the extent they "would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.* at 1530.

Interrogation is both express "questioning initiated by law enforcement officers" (Miranda, *supra* at 1612) and "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response ...." Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 1690-91, 64 L.Ed.2d 297 (1980 clarifying the Miranda definition of interrogation).

Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 1504, 201 L.Ed.2d 381 (1968) makes it clear that Miranda applies in the prison setting. However, corrections officers are not required to administer warnings every time they speak with an inmate. There is no *per se* rule that compels the use of Miranda warnings prior to all prisoner interrogations or that a prison inmate is automatically

always in custody within the meaning of Miranda. " United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985)  Inmates are only entitled to Miranda warnings if subjected to custodial interrogation. To determine if the inmate is in custody in a prison setting thereby mandating pre- interrogation Miranda warnings, the Court must use a "restriction of movement" standard instead of the non-prisoner "freedom of movement" standard.  Is there "some act which places further limitations on the prisoner[?]" United States v. Conley, *supra at 973* (adopting Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir. 1978) determination of "whether the inmate was subjected to more that the usual restraint on a prisoner's liberty to depart.").  Under Cervantes, *supra* at 428 and Garcia v. Singletary, 13 F.3d 1487, 1492 (11th Cir. 1994) the Court must use the following four factors in its examination of the totality of the circumstances to determine if "a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." Cervantes, *supra*. Those four factors are: "[1] the language used to summon the individual, [2] the physical surroundings of the interrogation, [3] the extent to which he is confronted with evidence of his guilt, [4] and the additional pressure exerted to detain him." *Id.*

With respect to the statement Andrews made to FBI Special Agent Watson, the United States concedes Defendant Andrews was in custody at the time it was made.  The evidence is clear and undisputed that Andrews had been given his Miranda warning prior to his making the statement.

With respect to the statement Andrews is reported to have made to Nurse McRobie, to wit: "I don't know anything." [DE 165, Ex. 2], the undersigned finds from a totality of the evidence that [1] no evidence was offered to establish "the language used to summon" Andrews to the medical assessment.  At best the evidence established that Nurse McRobie was in a portion of the prison medical facility cleaning up after working on Jesse Harris.  Someone Nurse McRobie no longer

7

remembers came to him and told him he needed to do medical assessments on some prisoners. It was not unusual for Nurse McRobie to do medical assessments on prisoners. He does assessments on prisoners injured doing work or playing sports within the confines of the prison. Nurse McRobie testified the purpose of such assessments is to determine if an inmate has an injury that needs medical treatment. The evidence established that he got what he needed and went to perform the assessments. The assessment was performed on Andrews at approximately 10:30 p.m. on October 7, 2007. He did not know in advance who he would be assessing. As he performed the assessment, Nurse McRobie obviously knew he was assessing inmate Andrews for what was reported by someone other than Andrews as a possible non-work related injury that happened in the "yellow corridor at 6:35 pm on October 7, 2007. That information is in blanks 2, 6 and 7 of the Inmate Injury Assessment and Followup form ( DE 165-2). There is no evidence to support any finding that Andrews gave this information to the nurse or that the nurse independently had the information. The undersigned further finds [2] the physical surroundings of the alleged interrogation was probably one of the three cells located in the lieutenant's office within the prison. Nurse McRobie was not certain that was where he did the assessment. He did 95% of the assessments in the cells in the lieutenant's office. It is standard operating procedure to have a corrections officer present, but Nurse McRobie did not know if there was one present on this occasion or who that may have been. He was also unsure whether Andrews was shackled at the time of the assessment. Nurse McRobie testified he did not believe he conducted the medical assessment of Andrews in the special housing unit (SHU). The undersigned finds that [3] Nurse McRobie did not confront Andrews with evidence of his guilt during the medical assessment. Nurse McRobie testified he asked the questions and performed the medical assessment ("Visual Examination of body for injury" ) based on the form. When he

inquired whether Andrews was injured in order to answer blank 9[2] of the form, Andrews is reported by the nurse to have said: "I don't know anything." While this statement attributed to Andrews may have been intended to exonerate him of the Harris attack, it is of no significance in this court's application of Miranda. (see Miranda, *supra* at 1628-1629 and Rhode Island v. Innis, *supra* at 1690 n. 5). The undersigned finds [4] no additional pressure was exerted on Andrews to detain him. The evidence is clear that Nurse McRobie assessed Andrews in a cell in the lieutenant's office like he had 95% of the other inmates he had assessed. Although nurse McRobie is unsure whether an officer may have been in the room with Andrews during the assessment, he does not recall more than one officer being present or who the one officer may have been. Whoever the officer was, Nurse McRobie does not testify the officer played any role in the assessment. He was just physically present. To the extent Andrews may have been shackled, attended by a corrections officer, and in a cell in the lieutenant's office, the undersigned finds those circumstances indicative of background restraint as opposed to police restraint. United States v. Conley, 779 F.2d 970 (4th Cir. 1985). The assessment only took a few minutes. Nurse McRobie directed Andrews to show his hands and fingers, to lift his arms, and the nurse pulled up the legs of his pants to observe his lower legs. Nurse McRobie reported "no [symbol used] injuries found." (DE 165-2, blank 11). It is obvious someone other than Nurse McRobie or Andrews told Nurse McRobie that Andrews was going to the SHU because the nurse wrote in blank 12 of the form "medically cleared for placement in SHU."

The undersigned finds no evidence to support the contention or suggestion by counsel for the Andrews that the medical assessment form was prepared and the questions therefor posited to

---

[2]Blank 9 of the Inmate Injury Assessment and Followup form reads: "9. Subjective: (*Injured's Statement as to How Injury Occurred*)(*Symptoms as Reported by Patient*)"

Andrews in order to elicit from him some sort of statement usable in a case against him. To the contrary, the questions asked of Andrews by Nurse McRobie appear to be from the form and designed only to obtain information for use in the medical assessment context. The undersigned finds from the evidence that the sole purpose of Nurse McRobie meeting with Andrews in a cell in the lieutenant's office on the evening of October 7, 2007 was to do a medical assessment and to determine if Andrews had injuries that required medical attention. It was not for the purpose of interrogation.

Applying the tests and the reasonable person standard to the totality of circumstances surrounding Andrews' making of the statement: "I don't know anything" the undersigned finds that, in the unique context of the prison setting, Andrews was not "in custody" for Miranda purposes at the time of his medical assessment. Even if he was in restraints of some kind during the assessment, the evidence supports and a reasonable prisoner would have expected that, as part of the procedure and to protect staff, restraints would be used. There is no evidence offered that Andrews was more restricted than other prisoners undergoing a similar medical assessment.

It is not completely clear from the evidence whether Andrews met with Special Agent Watson before or after his medical assessment by Nurse McRobie. The foregoing analysis assumed Andrews met with Nurse McRobie prior to his being questioned by Special Agent Watson.

On the other hand, if Andrews was seen by Special Agent Watson prior to being medically assessed by Nurse McRobie, the evidence is clear and not contradicted that Andrews had already been given his Miranda warnings by Watson. The approximate time frame would be: 6:35 p.m. attack on Harris followed by meeting with Agent Watson followed by 10:30 p.m. medical assessment.

The Fourth Circuit in United States v. Frankson, 83 F.3d 79, 83 (4th Cir. 1996) held that "the mere passage of time ... does not compromise a Miranda warning Courts have consistently upheld the integrity of Miranda warnings even in cases where several hours have elapsed between reading the warning and the interrogation .... "We too believe that [defendant's] initial Miranda warning was in no way compromised by the passage of two and one-half hours between the issuance of his warning and the point at which he began to confess his crimes and cooperate with police."

Accordingly, even if the District Court were to construe Nurse McRobie's medical assessment as an "interrogation", the several hour delay that occurred between Special Agent Watson's giving of Miranda warnings to Andrews and the 10:30 medical assessment of Andrews did not compromise the prior issuance of the warning to a point that the statement made to Nurse McRobie would be subject to suppression.

## III.
## Recommended Decision

Accordingly, the undersigned **RECOMMENDS** the statement Andrews made to FBI Special Agent Watson to the effect "he had no idea what the Agents were talking about and he did not wish to make a statement[.]" was made after being advised of his rights and **NOT BE SUPPRESSED.**

The undersigned further **RECOMMENDS** that the statement: "I don't know anything[.]" Andrew's made to Nurse McRobie during the medical assessment was not made as a result of a custodial interrogation and / or was made after being advised of his Miranda rights by Special Agent Watson in proximity of time to the medical assessment and therefore **NOT BE SUPPRESSED**.

The undersigned **RECOMMENDS** that Defendant Andrews' **MOTION TO SUPPRESS**

11

**STATEMENTS (DE 140) BE DENIED.**

Any party may, within fourteen (14) days after being served with a copy of this Memorandum Opinion, Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Memorandum Opinion, Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Memorandum Opinion, Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Memorandum Opinion, Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed provide electronic notification of this Memorandum Opinion, Report and Recommendation to counsel of record.

DATED: December 24, 2013

*John S. Kaull*
**JOHN S. KAULL**
**UNITED STATES MAGISTRATE JUDGE**