IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

Plaintiff,

v.  Criminal Action No. 1:12-cr-100

PATRICK FRANKLIN ANDREWS (1),
and
KEVIN MARQUETTE BELLINGER (2),

Defendants.

## MEMORANDUM OPINION, REPORT AND RECOMMENDATION

### I. RELEVANT GENERAL PROCEDURAL HISTORY

Defendant Patrick Franklin Andrews ("Andrews") stands indicted for murder pursuant to 18 U.S.C. §§ 1111 & 1118. The Government filed and served a Notice of Intent to Seek the Death Penalty pursuant to 18 U.S.C. § 3593. (Docket No. 46.)

Count One of the Indictment charges that "[o]n or about October 7, 2007, in Preston County, within the Northern District of West Virginia, PATRICK FRANKLIN ANDREWS and KEVIN MARQUETTE BELLINGER, the defendants herein, while confined in a Federal correctional institution, namely the United States Penitentiary at Hazelton, West Virginia, while each was under a sentence for a term of life imprisonment, aided and abetted by each other, did unlawfully kill Jesse Harris with malice aforethought, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in violation of Title 18, United States Code, Section 1118 and Section 2."

The grand jury returned "Notice of Special Findings" with respect to Count One. This notice mirrored the Government's Notice of Intent to Seek the Death Penalty as to Defendant Patrick Franklin Andrews ("Notice"). (Docket No. 46.) Of particular note are paragraphs (g), (h), and (i)

of the Notice within Count One of the Indictment.[1] The Government contends these convictions, if proved, are aggravating circumstances which justify imposition of the death penalty should Andrews be convicted of the substantive offense Charged in Count One. See 18 U.S.C. § 3592(c)(2)-(4).

Pursuant to the order of the District Judge, this case was designated as "complex." (Docket No. 68.) By Pretrial and Trial Scheduling Order, dated December 21, 2012, trial was scheduled to commence with jury selection on June 9, 2014. (Docket No. 71.)

On October 7, 2013, death-qualified counsel filed a Motion to Suppress Statements (Docket No. 140), a Motion to Suppress Seizure of Blood, Saliva, and Hair (Docket No. 141), a Motion to Compel Mandated Discovery and Brady Material (Docket No. 142), and a Motion to Suppress Search of Person (Docket No. 143.) The motions were referred to the undersigned by the District Judge by Orders dated October 8, 2013 (Docket No. 147) and November 1, 2013 (Docket No. 169).

On October 28, 2013, the Government filed its Response to Andrews' Motion to Suppress Search of Person. (Docket No. 166.)

On November 8, 2013, came Andrews in person and by his counsel, Harry J. Trainor, Jr., and Stephen D. Herndon, and the United States by Assistant United States Attorney Brandon Flowers and Richard Burns for a hearing on the motions.

---

[1] These paragraphs state as follows: "(g) has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person (18 U.S.C. Section 3592(c)(2)); (h) has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute (18 U.S.C. Section 3592(c)(3)); (i) has previously been convicted of two or more Federal or State offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. Section 3592(c)(4))."

## II. MOTION TO SUPPRESS SEARCH OF PERSON [DE 140]

### A. Contentions of the Parties

In his motion, Andrews seeks to suppress "all evidence seized by law enforcement officers in a search of his person." (Defendant's Motion at 2, Docket No. 143.) Specifically, Andrews states that on October 7, 2007, Registered Nurse ("RN") David McRobie, then "an employee of the BOP at USP Hazelton, visually examined [his] body . . . while processing him for transfer to the SHU." (Id. (alteration in original)) Andrews argues that no search warrant authorizing this search was issued, and that "[i]n the absence of some recognized exception to the requirement for a search warrant, any evidence seized from the inspection of [his] person . . . must be suppressed." (Id. at 3 (alterations in original)).

In its response, the Government asserts that RN McRobie did not obtain any physical evidence during his medical assessment of Andrews. (Government's Response at 2, Docket No. 166.) The Government first argues that RN McRobie's medical assessment was reasonable because prison staff developed individualized suspicion that Andrews engaged in criminal behavior. (Id. at 4.) The Government further alleges that RN McRobie's medical assessment of Andrews was justified under the special needs exception because it was done "not for the purpose of obtaining incriminating evidence against the defendant, but to determine if he was injured and needed medical treatment." (Id.)

Andrews filed a supplemental memorandum following the November 8, 2013 hearing. In this document, he asserts that if RN McRobie's "physical examination was for investigation of the incident of October 7, 2007, [he] had a right to privacy which was violated." (Docket No. 176 at 5.) He also states that "if the examination was a medical examination despite the often contradictory

3

testimony of Officer McRobie, [his] HIPAA rights were violated." (Id.)

B. **Relevant Factual Outline**

Based on the hearing testimony and the exhibit attached to the Government's response, the undersigned finds the following relevant facts:

1. On October 7, 2001, Jesse Harris, an inmate at USP Hazelton, was stabbed to death.

2. Prison staff observed inmate Bellinger attacking Harris.

3. Prison staff chased inmate Bellinger.

4. Bellinger was apprehended by prison staff in the yellow corridor of the prison.

5. Pursuant to prison policy, after the attach on and death of Jesse Harris, prison officials conducted an investigation. The prison investigation was conducted using prison staff supervised by Special Investigative Services ("SIS") and the FBI. The investigation took three general procedural routes: (1) use of prison staff to interview each of the 1,200 inmates at the prison for approximately 10 minutes to determine whether they had anything to say; (2) securing selected video from the prison video surveillance system; and (3) SIS and FBI interrogation of Andrews.

6. Staff later reviewed prison surveillance video and identified inmate Andrews as a second assailant of Harris.

7. Using prison surveillance video, staff observed Andrews place items into a trash can following the assault.

8. Staff recovered these items and identified them as a shank wrapped in a shirt. These items both appeared to have blood on them.

9. Prison staff went to the B-2 housing unit, where Andrews was housed, and took him into custody at his cell.

10. RN McRobie was the only member of the USP Hazelton medical staff on duty during the afternoon shift on October 7, 2007.

11. Upon being summoned to respond to the incident, RN McRobie secured the medical department, grabbed his trauma bag, and responded to the Yellow Corridor.

12. RN McRobie performed a quick medical assessment of Harris and determined that

he needed immediate treatment in the medical ward.

13. From the time of his medical assessment of Harris until approximately five hours later, RN McRobie was in the medical ward providing medical treatment to Harris and cleaning up after Harris' body was removed.

14. During this time, RN McRobie received no information as to the exact nature of the incident or who may have been involved.

15. Approximately five hours after the time he responded to the Yellow Corridor, RN McRobie was asked by prison staff to do a medical assessment on two inmates in accord with standard operating procedure at Hazelton to do medical assessments on inmates and staff who may have been injured.

16. RN McRobie went to the lieutenant's office, where Andrews and Bellinger were located in the holding cells.

17. RN McRobie conducted a medical assessment of Andrews. This involved a visual inspection of Andrews' scalp, hairline, tongue, and hands. RN McRobie also looked at and under Andrews' fingernails for injuries. He also asked Andrews to take off his shirt so that he could visually inspect his torso and raise his pant legs to inspect his lower legs.

18. RN McRobie did not take anything from Andrews' person during his medical assessment.

19. No prison investigator was present during the medical assessment.

20. RN McRobie used a form provided by Hazelton to conduct the medical assessment. On this form, he noted in Block 10, "Objective," "visual examination of body for injury." In Block 11, "Assessment," he noted "[symbol for zero] injuries found."

21. RN McRobie asked Andrews, "Are you injured or hurt anywhere?" He reported Andrews to have answered "I don't know anything." (Government's Response, Exhibit 2, Docket No. 166-1.)

22. In Block 12 of the medical assessment form, "Plan," RN McRobie wrote that Andrews was "medically cleared for placement in SHU." RN McRobie did not make the decision to place Andrews in the SHU.

23. RN McRobie delivered the form to the operations lieutenant. He did not make any verbal reports on his findings to anyone.

C.  Analysis

1. The Fourth Amendment Does Not Apply to RN McRobie's Conduct

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

The phrase "search and seizures" "connotes that the type of conduct regulated by [it] must be somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity." United States v. Attson, 900 F.2d 1427, 1429 (9th Cir. 1990). Accordingly, "governmental conduct that is motivated by investigatory or administrative purposes will fall within the scope of the [F]ourth [A]mendment since such conduct constitutes a search or seizure." Id. at 1430-31.

Neither the Supreme Court nor the Fourth Circuit have yet commented on whether the Fourth Amendment applies to medical services provided by medical professionals employed by a governmental entity. In any event, the analysis used for determining whether private parties are subject to the Fourth Amendment's constraints is "equally applicable in the context of deciding whether non-law enforcement government employees are subject to [it]." Id. at 1433 (alteration in original). Accordingly, courts must consider "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003) (citations omitted).

On October 7, 2007, the date of the incident, RN McRobie was employed on the medical

6

staff at Hazelton, an institution managed by the Bureau of Prisons. Accordingly, the undersigned finds that he was a non-law enforcement government employee at that time. Furthermore, it is clear from the record that the Government knew of and acquiesced in RN McRobie's medical assessment of Andrews. RN McRobie did not make the decision to perform the assessment. Instead, the request for the assessment came from correctional officers. Accordingly, the undersigned finds that RN McRobie's conduct meets the first step of the analysis under Jarrett.

The undersigned must next consider whether RN McRobie "intended to assist law enforcement or had some other independent motivation." Id. RN McRobie testified that his primary purpose as a member of the medical staff at Hazelton was to ensure the health and safety of inmates. During the approximate five hours that elapsed between the time he responded to the Yellow Corridor to assess Harris and the time he was asked to perform a medical assessment on Andrews, RN McRobie received no information as to the exact nature of the incident and who may have been involved. Furthermore, it is standard operating procedure at Hazelton for medical staff to perform these assessments at any time inmates or staff may have been injured. During the assessment, the only question RN McRobie asked Andrews was, "Are you injured or hurting anywhere?" Given all this, the undersigned finds that RN McRobie's motivation in performing the medical assessment was to determine whether Andrews needed medical care, not to assist prison officials in collecting possible evidence for investigatory purposes.

The undersigned notes that Attson provides great support for this determination. On June 21, 1986, Attson lost control of his vehicle and crashed, "resulting in the death of one of his passengers." Id. at 1429. He was treated at a nearby hospital by Dr. Patel, who was an employee of the federal government. Id. Medical personnel detected alcohol on Attson's breath, and Dr. Patel

instructed that a blood sample be taken because he "reasoned that the presence of alcohol in Attson's body might mast symptoms of serious pain and might be important in determining the sorts of medicines that could be administered." Id. The results of the sample were later released pursuant to a grand jury subpoena. Id. Accordingly, the Ninth Circuit considered "whether the strictures of the [F]ourth [A]mendment apply to the conduct of a government doctor who, for medical reasons, takes a blood sample from a criminal suspect and conducts a blood alcohol analysis on that sample." 900 F.2d at 1429. Dr. Patel had testified that "(1) he normally requests a blood sample in this type of accident for medical reasons, and (2) that he indeed drew the blood for medical reasons." Id. at 1433 (internal quotation marks omitted). Given this, the Ninth Circuit concluded that the district court's finding that Dr. Patel acted with a medical purpose was not clearly erroneous, and that the district court "properly refused to suppress the evidence of Attson's blood alcohol level." Id.

The conduct at issue here is substantially similar to that at issue in Attson. Similar to Dr. Patel, RN McRobie was a registered nurse employed by the federal government. Furthermore, RN McRobie, like Dr. Patel, provided testimony indicating that he performed the assessment for medical purposes and that it was standard operating procedure at Hazelton to perform these assessments when either inmates or staff may have been injured. The undersigned cannot understand how RN McRobie's visual assessment of Andrews for medical purposes would fall within the constraints of the Fourth Amendment when Dr. Patel's taking of a blood sample for medical purposes, a more invasive procedure, did not. See id. For these reasons, the undersigned finds that RN McRobie did not act with the "inten[tion] to assist law enforcement." Id. (alteration in original). Accordingly, his conduct is not subject to suppression.

B.  **Even If RN McCrobie's Conduct Was a Search, It Falls Within the "Special Needs" Exception to the Fourth Amendment's Warrant Requirement**

For the Fourth Amendment to apply to a search, a person must have a reasonable expectation of privacy in the item to be searched. See United States v. Davis, 690 F.3d 226, 241 (4th Cir. 2012). The Fourth Circuit has recognized that inmates retain a limited Fourth Amendment right to bodily privacy. See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981); see also Fortner v. Thomas, 983 F.2d 1024, 1030 (10th Cir. 2003) (holding that inmates have a constitutional right to bodily privacy). Accordingly, Andrews has a reasonable expectation of bodily privacy.

A warrantless search only violates the Fourth Amendment when it is unreasonable. Davis, 690 F.3d at 241. When "'a Fourth Amendment intrusion serves *special governmental needs*, beyond the normal need for law enforcement,' a warrantless search is justified when balancing the individual's privacy expectations against the government's interests leads to the determination that it is 'impractical to require a warrant or some level of individualized suspicion in the particular context." United States v. Rendon, 607 F.3d 982, 989 (4th Cir. 2010) (quoting Nat'l Treas. Employees Union v. Von Raab, 489 U.S. 656, 665-66 (1989)). The Supreme Court has stated that a "detention facility is a unique place fraught with serious security dangers" and that "ensuring security and order" is a legitimate objective. Bell v. Wolfish, 441 U.S. 520, 560-61 (1979); see also Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" and noting that the "recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions").

As noted above, prison staff, using video surveillance, observed Andrews assault Harris and walk away from the scene of the attack. They also observed Andrews discard items in a trash can. These items were recovered and identified as a metal weapon wrapped in a shirt. These items appeared to have blood on them. Given these facts, the undersigned finds that it was reasonable for RN McRobie to conduct a medical assessment on Andrews to determine whether he suffered any injuries that may have required treatment. After all, prison staff "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." Hudson, 468 U.S. at 526-27. Hypothetically, if Andrews had suffered injuries that were not assessed or treated by RN McRobie, not only would staff at Hazelton have violated this obligation, they also would have exposed themselves to potential liability under the Eighth Amendment for providing inadequate medical care. See generally Estelle v. Gamble, 429 U.S. 97 (1976). Accordingly, if RN McRobie's conduct is considered to be a search within the meaning of the Fourth Amendment, the undersigned finds that the special needs encountered by prisons permitted the warrantless assessment of Andrews.

### C. Andrews' Constitutional and HIPAA Rights Were Not Violated By the Disclosure of the Medical Assessment Form

As noted above, Andrews' final argument is that the disclosure of the medical assessment form completed by RN McRobie violated his constitutional and Health Insurance Portability and Accountability Act ("HIPPA"), 42 U.S.C. § 1320d *et seq.*, privacy rights. The undersigned cannot agree. First, the Fourth Circuit has declined to extend the constitutional right to privacy to medical records. See Watson v. Lowcountry Red Cross, 972 F.2d 482, 487-89 & n.9 (4th Cir. 1992); see also Anderson v. Romero, 72 F.3d 518, 523 (7th Cir. 1995) (declining to extend privacy right to inmate

10

medical records).²

Furthermore, assuming *arguendo* that the disclosure of Andrews' medical assessment form violated HIPPA, "HIPPA itself does not provide that medical information . . . obtained [in violation of its provisions] must be suppressed." United States v. Elliott, 676 F. Supp. 2d 431, 439 (D. Md. 2009). While it is important to protect a "patient's right to privacy in medical records," the right is "not absolute, and must be balanced against the government's interests in obtaining the information." Id. (citing United States v. Sutherland, 143 F. Supp. 2d 609, 611-12 (W.D. Va. 2001)). Here, the undersigned finds that prison officials had a legitimate interest in obtaining this information to ensure that there were no medical impediments to placing Andrews in the SHU. Accordingly, Andrews' alleged violations of privacy also do not provide grounds for suppression.

### III. RECOMMENDED DECISION

For the foregoing reasons, the undersigned **RECOMMENDS** that Andrews' **MOTION TO SUPPRESS SEARCH OF PERSON** (Docket No. 143) **BE DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Memorandum Opinion, Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Memorandum Opinion, Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the

---

²The Second and Third Circuits have held that prisoners do retain privacy rights in their medical records. See Doe v. Delie, 257 F.3d 309, 317 (3d Cir. 2001); Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999). However, this right is not absolute; instead, the right "is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security," Doe, 257 F.3d at 317. Doe and Powell are not mandatory authority for this Court, and even if they were, the undersigned finds that the disclosure of RN McRobie's medical assessment form was proper for officials to ensure that Andrews was medically cleared for placement in the SHU.

Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Memorandum Opinion, Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Memorandum Opinion, Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide electronic notification of this Memorandum Opinion, Report and Recommendation to counsel of record.

DATED: 17 January 2014

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE