IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                   **CRIMINAL NO. 1:12CR100-1**
                                                             **(Judge Keeley)**

**PATRICK FRANKLIN ANDREWS,**

    **Defendant.**

**ORDER OVERRULING OBJECTION [DKT. NO. 278],
ADOPTING REPORT AND RECOMMENDATION [DKT. NO. 245],
AND DENYING MOTION TO SUPPRESS [DKT. NO. 143]**

On October 2, 2012, the defendant, Patrick Franklin Andrews ("Andrews"), was indicted and charged with murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. § 1118, and second degree murder within federal jurisdiction, in violation of 18 U.S.C. § 1111. Andrews stands accused of fatally stabbing fellow inmate, Jesse Harris ("Harris"). The killing occurred at the United States Penitentiary Hazelton ("USP Hazelton") in Bruceton Mills, West Virginia on October 7, 2007, at approximately 6:30 p.m. After the incident, prison staff reviewed surveillance video and identified Andrews as one of two suspected killers.[1]

The evening the incident occurred, registered nurse David McRobie ("RN McRobie") was the only member of the USP Hazelton medical staff on duty. His priority was to examine Harris, whom he

---

[1] The other suspect, Kevin Marquette Bellinger, was Andrews' co-defendant until the Court severed the two on November 26, 2013. (Dkt. No. 192).

### ORDER OVERRULING OBJECTION, ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS

immediately took to the medical ward to provide treatment. At approximately 11:30 p.m., the lieutenant in charge ordered RN McRobie to perform a medical examination of Andrews. This involved a visual inspection of Andrews' body and required Andrews to lift up his pant legs and remove his shirt. RN McRobie also looked under Andrews' fingernails and asked him whether he was hurt, to which Andrews responded "I don't know anything." After the examination, RN McRobie filled out a Bureau of Prisons Inmate Injury Assessment form, noting "0 injuries found" and that Andrews required "no medical attention." RN McRobie then delivered the form to the lieutenant and filed a copy in Andrews' medical record.

On October 7, 2013, Andrews filed a motion to suppress "all evidence seized by law enforcement officers in a search of his person" because it was obtained without a warrant. The Court referred the motion to the Honorable John S. Kaull, United States Magistrate Judge, who entered a memorandum opinion, report and recommendation ("R&R") on January 17, 2014. The R&R recommended that the Court deny Andrews' motion because (1) RN McRobie's medical examination did not constitute a "search," (2) even if the examination were a search, it fell within the "special needs" exception to the Fourth Amendment's warrant requirement, and (3) medical records obtained in violation of a defendant's

constitutional privacy rights and rights under the Health Insurance Portability and Accountability Act ("HIPAA") are not necessarily subject to suppression. On January 30, 2014, Andrews filed objections to the R&R, arguing that Judge Kaull's conclusions were erroneous.

**I.**

The Court "shall make a de novo determination of <u>those portions</u> of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636 (emphasis added); <u>see also</u> <u>Farmer v. McBride</u>, 177 Fed. App'x 327, 330-31 (4th Cir. 2006) ("The district court is only required to review <u>de novo</u> those portions of the report to which specific objections have been made . . . ."). "As to those portions of a recommendation to which no objection is made, a magistrate judge's findings and recommendation will be upheld unless they are 'clearly erroneous.'" <u>Clark v. United States</u>, No. 5:05CV147, 2008 WL 2704514, *3 (N.D.W. Va., July 3, 2008).

**II.**

The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend IV. When a defendant believes the Government has

obtained evidence in violation of this protection, he files a motion to suppress the evidence by way of the judicially created "exclusionary rule," which "forbids the use of improperly obtained evidence at trial" in order to "safeguard Fourth Amendment rights." Herring v. United States, 555 U.S. 135, 139-40 (2009). Thus, a successful suppression motion will demonstrate, at a minimum, an unlawful search or seizure that produced tainted evidence.

Andrews has failed to meet these minimum requirements to succeed on his motion. First, he has not specifically identified the evidence he seeks to suppress, and prison staff took nothing from Andrews' person during the medical examination. Andrews' motion thus appears to be a prophylactic effort to exclude hypothetical evidence. Nevertheless, the Court will assume that Andrews seeks to exclude from trial some "derivative evidence, [either] tangible [or] testimonial." Murray v. United States, 487 U.S. 533, 536 (1988).

In so doing, the Court next must consider whether RN McRobie's visual inspection of Andrews constituted a "search" within the meaning of the Fourth Amendment. This question depends largely on RN McRobie's status as either a law enforcement or a non-law enforcement governmental party. While "it is of course clear that the restrictions of the Fourth Amendment apply to the investigatory

stages of police conduct," United States v. Foust, 461 F.2d 328, 330 (7th Cir. 1972), non-law enforcement governmental conduct only constitutes a search if "such conduct has as its purpose the intention to elicit a benefit for the government in either its investigative or administrative capacities." United States v. Attson, 900 F.2d 1427, 1431 (9th Cir. 1990). As a medical provider, RN McRobie falls into the non-law enforcement category. Thus, the Court must look behind his status to determine whether the purpose of the medical examination was to assist prison staff in their investigative or administrative capacities.

During his testimony, RN McRobie was asked to explain the "primary purpose" of his medical assessment. (Hr'g Tr. 18:15-16). He responded, "[t]o document any injuries to that inmate." Id. at 18:17. Again, RN McRobie was asked, "what is the purpose of a medical assessment?" Id. at 17:14. He answered, "to make sure that they are medically clear." Id. at 17:19-20. According to RN McRobie, his primary purpose at USP Hazelton was to "ensure the safety and health of the inmates." Id. at 27:13-16.

Moreover, RN McRobie testified that he did not attempt to elicit incriminating statements from Andrews, did not take any items from Andrews, and did not ask Andrews any questions other than whether he was hurt. Id. at 18:14, 20:18-25. He further

5

testified that the lieutenant who ordered the medical examination was not involved in any way, nor did he direct RN McRobie as to how he conducted the examination or the questions he asked Andrews. Id. at 22:23-24:13 (Q. "Did anyone ask you to help them find evidence or get statements from Mr. Andrews?" A. "No, sir."). Finally, RN McRobie repeatedly explained to counsel for Andrews that he was never informed as to the details of the incident other than that Harris was badly injured. See, e.g., id. at 30:15-19. This testimony leaves little doubt that RN McRobie's purpose in performing the medical examination on Andrews was solely medical, not investigatory.

Nevertheless, Andrews points to several facts that he suggests undermine this conclusion. First, he argues that the five-hour lapse between RN McRobie's examination of Harris and his examination of Andrews negates any medical purpose underlying the latter. That argument, however, fails to account for the time it took prison staff to ascertain Andrews' involvement by reviewing surveillance video. Furthermore, the argument assumes that medical assessments are only necessary in emergency situations. Prison staff could see that Andrews did not require emergency medical attention, and thus RN McRobie, who was the only medical staff at the penitentiary and was occupied with Harris, did not rush to

**USA V. PATRICK FRANKLIN ANDREWS**                                    **1:12CR100-1**

**ORDER OVERRULING OBJECTION, ADOPTING REPORT AND
RECOMMENDATION AND DENYING MOTION TO SUPPRESS**

examine Andrews. Nonetheless, Andrews' medical clearance was necessary, and RN McRobie performed the examination within a reasonable amount of time.

Second, Andrews suggests that, because the lieutenant ordered the medical assessment, the examination necessarily involved investigatory purposes. The lieutenant was in charge of managing the Harris incident, and his responsibilities included ensuring that anyone involved was medically cleared. As RN McRobie testified, he had no idea that Andrews was a suspected participant. Thus, the lieutenant ordered the medical examination. RN McRobie testified that the lieutenant was not involved in the examination in any way, nor did he direct the examination or RN McRobie's questions to Andrews. That the lieutenant ordered the examination does not convert its purpose from medical to investigatory.

Third, Andrews argues that the medical examination was investigatory because RN McRobie looked under Andrews' fingernails, and, according to Andrews, "[s]uch an examination contributes nothing to an assessment of whether or not Patrick Andrews needs medical treatment." The following exchange took place on cross-examination of RN McRobie:

Q.   Okay, did you look under his nails?

A.   Yes, I did.

7

> Q. Okay, why did you look under his nails? What are you looking for?
>
> A. Any injury. Anything that might, you know, be blood, tissue. Anything.
>
> Q. Blood, tissue, DNA material?
>
> A. No. <u>I don't look for DNA material</u>. I look because your hands are used whenever you're involved in any type of altercation. Usually, I would look more for scrapes or skins on the knuckles.
>
> . . .
>
> Q. But you also looked under the fingernails?
>
> A. I look at the fingernails.
>
> Q. Okay. And that's to find material that might have come from a potential opponent?
>
> A. Negative, sir.
>
> Q. No?
>
> A. Negative.
>
> Q. What is it to look for then?
>
> A. I looked at the fingernails, okay. <u>I never looked for DNA material</u>. That was not my job.

<u>Id.</u> at 41:10-42:7 (emphasis added). Nothing from this testimony suggests that RN McRobie surreptitiously examined Andrews' fingernails in order to collect DNA evidence for the lieutenant. To the contrary, RN McRobie repeatedly explained he was not looking

8

**ORDER OVERRULING OBJECTION, ADOPTING REPORT AND
RECOMMENDATION AND DENYING MOTION TO SUPPRESS**

for DNA material. When a prisoner is involved in a fight, it makes good sense to inspect thoroughly the prisoner's hands for injury.

Finally, Andrews points to Box 9 of the BOP Inmate Injury Assessment form, filled out by RN McRobie after the examination, captioned "Subjective: (Injured's Statement as to How Injury Occurred) (Symptoms as Reported by Patient)." Andrews contends that such information "is only marginally relevant to the need for medical treatment but centrally relevant to an investigation of an incident resulting in the injury." RN McRobie was specifically questioned about the purpose of Box 9. He explained that "[i]t is in the conduction -- when I walk in and ask any inmate if are you injured anywhere, are you hurt, if they say anything, that's what goes in the subjective statement." Id. at 25:15-18. In fact, RN McRobie sought this "subjective" information by asking Andrews whether he was hurt, to which Andrews responded, "I don't know anything." Andrews' suggestion that the information sought was investigatory constitutes nothing more than baseless speculation.

In sum, nothing about RN McRobie's medical examination of Andrews was investigatory. Its purpose was to conduct a routine medical inspection of, and medically clear, an inmate suspected of being involved in a violent incident. Because the purposes behind RN McRobie's medical examination were not investigatory, the

9

examination was not a "search" under the Fourth Amendment, and thus not subject to the prohibition against warrantless searches or the exclusionary rule. Therefore, the Court does not need to consider Judge Kaull's alternative finding that, even if the medical examination were a search, it would fall within the "special needs" exception to the prohibition against warrantless searches.

Nonetheless, Andrews argues that prison officials disclosed his medical records in violation of his right to privacy, as well as his HIPAA rights.[2] Andrews' assertion of his constitutional privacy rights has no merit. If Andrews is relying on his privacy rights under the Fourth Amendment, the Court has already determined that no "search," and therefore no violation, occurred. Andrews' reliance on privacy rights derived from other amendments is likewise misplaced in the context of a suppression motion, as the exclusionary rule does not apply generally to governmental invasions of privacy.[3] See United States v. Calandra, 414 U.S. 338, 347 (1974) ("The purpose of the exclusionary rule is not to

---

[2] Andrews fails to state clearly where the allegedly unlawful disclosure of his medical records occurred. The Court can only assume that he takes issue with RN McRobie's disclosure of the single-page BOP Inmate Injury Assessment form to the lieutenant.

[3] More typically, violations of one's constitutional rights are redressed through 42 U.S.C. § 1983. See Baker v. McCollan, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution . . . .").

redress the injury to the privacy of the search victim . . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."); see also Sherman v. Jones, 258 F. Supp. 2d 440, 443 (E.D. Va. 2003) ("[T]here is no general fundamental constitutional right to privacy in personal medical information.") (citing Whalen v. Roe, 429 U.S. 589 (1977)).

    Finally, the weight of authority suggests that suppression is not the appropriate remedy for evidence obtained in violation of HIPAA. See Elder-Evins v. Casey, No. C09-05775, 2012 WL 2577589, *6 (N.D. Cal., July 3, 2012) (collecting cases that have "refused to exclude evidence obtained in violation of HIPAA"); see also United States v. Prentice, 683 F. Supp. 2d 991, 1002 (D. Minn. 2010) ("[W]e are further unpersuaded that any [HIPAA] violation would warrant the suppression of the medical records."); United States v. Elliott, 676 F. Supp. 2d 431, 441 (D. Md. 2009) (concluding that "suppression is not the appropriate remedy" for evidence obtained in violation of HIPAA).

    Even if suppression were an appropriate remedy, it still would not be available to Andrews in this case. Federal regulations expressly permit health care providers (i.e., RN McRobie) to

disclose protected medical information about an inmate (i.e., Andrews) to a law enforcement official (i.e., the lieutenant) if the law enforcement official deems it necessary for the health and safety of the inmate or other inmates. See 45 C.F.R. 164.512(k)(5)(I). Ultimately, the lieutenant was responsible for Andrews' health and safety, and thus needed to rely on RN McRobie's medical report.

### III.

For the reasons discussed, the Court **OVERRULES** Andrews' objection, **ADOPTS** the R&R in its entirety, and **DENIES** Andrews' motion to suppress.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: April 23, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE