**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**                                                    **Criminal Action No. 1:12CR100-1**

**PATRICK FRANKLIN ANDREWS,**

**Defendant.**

## MEMORANDUM OPINION,  REPORT AND RECOMMENDATION

### I.
### Procedural History

On March 6, 2014, Defendant Patrick Franklin Andrews ("Andrews") filed an "Ex Parte Motion for Permission to Employ Expert" (DE 291).   Andrews seeks approval "to employ Dr. Fang Yang as an expert statistician for the purpose of reviewing Census and other population data together with the Court's Race/Gender Reports, to analyze that data using approved statistical modes of analysis, and to testify in a hearing on the defendant's Motion to Dismiss the Indictment alleging a violation of the constitutional right to a grand jury selected from a fair cross-section of the community."   The cost is estimated to be $3,000.00.

On December 13, 2013, Andrews filed a "Motion To Dismiss, Violation of Sixth Amendment Right to a Jury Composed of Fair Cross-Section of Community Claim," which challenges the grand jury's composition (DE 200).   Andrews asserts the indictment should be dismissed because "the jury *venire* selection process resulted in under representation of black jurors in the *venire* from which the grand jury which returned the indictment against Patrick Andrews operating to deny Patrick Andrews a jury composed of a fair cross-section of the community. " (DE 200).   The United States filed its response on February 14, 2014 (DE 271).

On May 12, 2014, the Court conducted an *ex parte* hearing on the motion to employ Dr. Yang. At the inception of the hearing, counsel for Andrews waived Andrews' appearance, advising the Court that he had discussed it with Andrews and Andrews did not believe his presence would add anything to or detract from the hearing and stated he waived his appearance. Since then, Andrews was relocated to another prison. Because of that move, counsel for Andrews was unable to secure a written waiver before the hearing.

Thereafter, the Court took the matter under consideration.

## II.
### Facts

The following facts are relevant and not disputed:

1) Jesse Harris ("Harris"), an inmate at USP Hazelton, was killed on October 7, 2007.

2) Within hours of the killing, inmates Andrews and Kevin Bellinger ("Bellinger") were identified by authorities as suspects.

3) At all times pertinent to the motion, there have been four (4) points (division) of holding court within the confines of the Northern District of West Virginia (Elkins, Clarksburg, Wheeling, and Martinsburg).

4) Andrews and Bellinger were indicted for the murder of Harris by a federal grand jury at the Wheeling, West Virginia, point of holding court on October 2, 2012 (DE 41).

4a) The Wheeling point of court selects grand jurors and petit jurors from Tyler, Wetzel, Marshall, Ohio, Brooke and Hancock Counties..

5) Count One of the Indictment charges Andrews and Bellinger with Murder by Federal Prisoner Serving a Life Sentence.

6) Count Two charges Andrews and Bellinger with the Second Degree Murder (of Harris).

7) The grand jury returned a "Notice of Special Findings" against Andrews

relative to Count One, making Andrews subject to the possibility of a sentence of death if convicted.

8) The grand jury that returned the indictment was selected in accord with the Amended Jury Selection Plan for the Northern District of West Virginia (hereinafter "the Plan"), adopted by District Court Order dated February 5, 2009, and approved by the United States Court of Appeals for the Fourth Circuit Judicial Council by Order No. 247 on February 25, 2009.

9) The list used for selection of the grand jury that indicted Andrews dated from December 2008, the date of the last general election prior to the Indictment.

10) Based on the "Source List Race/Gender Report Processed Questionnaires - Division: 5," prospective *venire* for the Wheeling point of court between August 2009 and July 2013, from which the 2012 Wheeling grand jury was selected, included thirty (30) African-American citizens, or 0.69% of the total available *venire* (4,345) for that point of holding court (DE 295, p. 4-6).

11) No African-American jurors were on the grand jury that indicted Andrews.

12) Andrews is an African-American male.

13) There is no evidence that anyone involved in the creation of the jury selection system, in use within the Northern District of West Virginia and used to select the grand jury that indicted Andrews, intentionally manipulated or framed the system to exclude African-American citizens from jury service.

14) There is no contention or evidence to support any claim or contention that anyone involved in the operation of the jury selection system for the Northern District of West Virginia that indicted Andrews manipulated the system to create the alleged under representation and alleged systemic exclusion of African-American citizens from the panel or *venire*.

### III.
### Contentions

Andrews contends:

1) Under representation of the African-American race in the grand jury that indicted Andrews is the result of systemic exclusion and not the result of random chance.

2) Statistical disparity is sufficient to establish a *prima facie* claim of denial of

3

equal protection, putting the burden of proving otherwise on the Government.

3) The ratio between African-American citizens and non-African-American citizens on the jury should be 10% or 11%, or 1.6 out of 16 grand jurors. There were no African-American citizens on the grand jury that indicted Andrews.

4) The system of jury selection in use promotes under representation of African-American citizens in the grand jury due to a combination of:

   A. the age (outdated nature) of the lists from which the *venire* is selected

   and

   B. the mobility of the African-American citizen population in the state of West Virginia.

The United States contends:

1) African-Americans are a distinctive group.

2) Andrews has not established that the number of African-Americans in the jury venire is not fair or reasonable in relation to the number of African Americans in the community.

3) Andrews has not established that the use of voter registration lists and licensed driver lists to select potential jurors operates to systematically exclude African s from potential jury venires.

## IV.
## Discussion

The United States Constitution guarantees criminal defendants a right to be tried by an impartial jury selected from a fair cross section of the community. Taylor v. Louisiana, 419 U.S. 522 (1975). Taylor was convicted of aggravated kidnaping in St. Tammany Parish, Louisiana. On appeal, he claimed he was not tried before a jury which represented a fair cross section of the population. Taylor was an African-American person. He was tried and convicted by an all male jury. Women were statutorily excluded or excused from jury service on the ground that women, as

4

a class, served a distinctive role in society (raising children), and jury service would substantially interfere with that function. Women could opt out of the exemption by signing a declaration or waiver of exemption. Reversing and remanding, the Court, with Chief Justice Burger writing for the majority, held:

1) [T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. Id. at 528.

2) We are also persuaded that the fair cross-section requirement is violated by the systematic exclusion of women, who in the judicial district involved here amounted to 53% of the citizens eligible for jury service. Id. at 531.

3) [W]e think it is no longer tenable to hold that women as a class may be excluded to given automatic exemptions based solely on sex if the consequence is that criminal jury *venires* are almost totally male. Id. at 537.

4) It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, . . .; but the jury wheels, pools of names, panels, or *venires* from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. Id. at 538.

The Constitutional fair cross-section requirement was extended to grand juries in Sims v. Georgia, 389 U.S. 404 (1967) (per curiam). Sims stands for the proposition that "a defendant is denied equal protection of the laws when he is indicted by a grand jury that is selected from a *venire* that does not represent a racially fair cross-section of the community." Sims was convicted in a Georgia state court of rape and was sentenced to death. During his first appeal, the Court reversed and sent the case back to state court because Sims had not received a hearing on his challenge to the voluntariness of his confession. Instead of conducting a *de novo* hearing, the trial judge reviewed

the original record, determined the confession was voluntary, and refused to consider any other challenge that had been a part of the first appeal to the Supreme Court. The Georgia Supreme Court affirmed. Sims again appealed to the Supreme Court, claiming his confession was coerced and involuntary and that he was denied due process because there were no African-American jurors on both the grand jury that indicted him and the petite jury, even though African-American citizens constituted 24.4% of taxpayers in the county. The Supreme Court reversed Sims' conviction holding:

> Petitioner also contends that he was indicted and tried by juries from which members of his race had been unconstitutionally excluded. The facts reveal that the grand and petit jury lists were drawn from the county tax digests which separately listed taxpayers by race in conformity with then existing Georgia law. Negroes constituted 24.4% of the individual taxpayers in the county. However, they amounted to only 4.7% of the names on the grand jury list and 9.8% of the names on the traverse jury list from which petitioner's grand and petit juries were selected. The State's only response to that showing was to call one of the jury commissioners as a witness; the jury commissioner testified that he or one of the other commissioners knew personally every qualified person in the county and did not discriminate in selecting names for the jury lists. The facts in this case make it virtually indistinguishable from Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Accordingly, it is clear that the juries by which petitioner was indicted and tried were selected in a manner that does not comport with constitutional requirements. See also Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25.

389 U.S. at 407-08.

In order "[t]o prevail on a challenge to the *venire*, based upon a fair cross-section claim, a defendant must show some evidence that the selection process is susceptible of abuse or is not racially neutral." Castaneda v. Partida, 430 U.S. 482 (1977). Partida, a Mexican-American individual, was indicted and convicted in the State of Texas. He filed a writ of *habeas corpus*, alleging discrimination against Mexican-American citizens in the selection of the grand jury that

indicted him. The District Court dismissed. The Fifth Circuit Court of Appeals reversed. On appeal to the Supreme Court, Justice Blackman, writing for the 5-4 plurality, held: "[A] showing that the population of the county was 79.1% Mexican-American, but that, over an 11-year period, only 39% of the persons summoned for grand jury service were Mexican-American, established a prima facie case of discrimination against Mexican-Americans in grand jury selection, which stood unrebutted absent evidence that racially neutral qualifications for grand jurors resulted in the low proportion of Mexican-Americans." *Id.* At the time, Texas used a "key man" system for selecting grand juries. Jury commissioners were appointed by the state District Judge. The jury commissioners selected prospective jurors from different portions of the county, and the District Judge then tested their qualifications to serve. In addition to being a citizen of the state and county in which they were to serve, the qualifications were individuals had to "be of sound mind and good moral character, be literate, have no prior felony conviction, and be under no pending indictment or other accusation." Id. at 482. At the proceedings below, no evidence was offered "about the method by which the commissioners determined the other qualifications for grand jurors prior to the statutory time for testing qualifications," and Justice Blackman held "no inference explaining the disparity by reference to the literacy, sound mind, moral character, and criminal record qualifications can be drawn from the statistics about the population as a whole." Id. at 483. Simply stated, presumption of discrimination is shown by a grand jury selection procedure that is susceptible to abuse or is not racially neutral as shown by substantial under representation of defendant's race or an identifiable group to which he belongs over a long period of time. Once such a showing is made, the burden shifts to the Government to rebut the presumption.

A *prima facie* case of discriminatory purpose may be proved as well by the absence

of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in a community, . . . or with racially non-neutral selection procedures . . . . With a *prima facie* case made out, 'the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.

Id. at 493-94 (citations omitted).

In Castaneda, the Court did not go so far as to find the Texas "key man" system unconstitutional. Instead, it found the system was "susceptible to abuse resulting in discrimination against particular groups." In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show: 1) "that the procedure employed resulted in substantial under representation of his race or of the identifiable group to which he belongs[1]"; 2) "the degree of under representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time" (sometimes called the "rule of exclusion"); and 3) "a selection procedure that is susceptible of abuse or is not racially neutral." Id. at 495.

Unlike the Texas "key man" system in Castaneda, the Northern District of West Virginia's system of selecting grand and petit jurors for and from the jury wheel is a racially neutral selection procedure. The Plan, adopted in 2009, requires the United States District Clerk for the Northern District of West Virginia ("Clerk") to "establish and maintain a master jury wheel for each division . . . once every four years." Section 2.02. There are four (4) divisions within the Northern District of West Virginia: Clarksburg, Elkins, Martinsburg, and Wheeling. Section 2.10. The Clarksburg

---

[1]"The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." Castaneda v. Partida, 430 U.S. 482, 494 (1977).

division is comprised of the following West Virginia counties: Harrison, Doddridge, Gilmer, Marion, Monongalia, Taylor, Ritchie, Calhoun, Braxton, Preston, and Pleasants. The Wheeling division is comprised of the following West Virginia counties: Ohio, Brooke, Hancock, Marshall, Tyler, and Wetzel. Id.

The Clerk maintains a master list for each division of court, which is compiled from two source lists: (1) "persons who are registered to vote in the county within the division" and (2) "persons who hold a valid motor vehicle operator's or chauffeur's license as determined from the drivers' license lists provided by the Division of Motor Vehicles." Section 2.03. In order to insure "the names chosen will represent all segments of the source file from which drawn," "the mathematical odds of any single name being picked are substantially equalized," and " the possibility of human discretion or choice affecting the selection of any individual's name is eliminated" the Clerk compiles and maintains a master jury wheel using the following procedures: 1) the Clerk combines the licensed drivers list and the voters registration list by using the licensed drivers list as primary and eliminating duplicate names in the voters registration list; 2) a name is selected at random from the list so combined and then additional names are drawn "systematically at regular intervals throughout the remainder of the source list." Section 2.04. Counsel for Andrews suggested the merger is done by a local college using a computer system.

The random number used to select the order in which the additional names are drawn is set forth in Section 2.06 a. The section calls for the Clerk to determine a quotient or the ratio of selected to unselected names. If the clerk needs 5,000 names on the master wheel and there are 50,000 possible names on the combined list, the quotient would be 5,000/50,000, or 10, and the Clerk would then select every tenth name on the list appearing after the first name selected. The starting number

is determined in accord with Section 2.06b. The starting number for selection of the first name is chosen by manually drawing by lot or by some automated method or any accepted randomizing method.

The master jury wheel for each division of court is drawn and refilled by August 1 of each year following a general election. Section 2.07.

In order to fill the need for jurors at a division of court for a particular period of time, the Clerk determines an estimated number of jurors needed to fill the qualified jury wheel and draws them from the master jury wheel. Counsel for Andrews suggested this selection is also done randomly by computer. The Clerk then sends those jurors jury questionnaires. Sections 2.08 and 2.09. It is from the qualified jury wheel that petit and grand jury panels are selected.

During the hearing, Andrews' counsel conceded he had no evidence of manual manipulation of the jury selection system. He described the process as "a triple random selection process" that is "very difficult for human manipulation." He further conceded there was no evidence that the system was intentionally designed to exclude participation by African-American citizens. With respect to the inquiry, he stated: "Your Honor, with all due respect to everyone who participated, I'm not sure I know anyone who is sophisticated enough to design this system that would result in a disparate representation of African-Americans on the jury panel based on voter registration and motor vehicle registration." (Electronic Record - FTR).

Andrews concedes the Fourth Circuit has held that selection of jurors from voter registration records is presumptively fair where the disparity does not exceed 20%. United States v. Lewis, 10 F.3d 1086 (4th Cir.1993). In Lewis, the defendant was convicted and challenged that he was denied his right to trial by a jury selected from a fair cross-section of the community. In his case, the

disparity between the proportion of eligible Caucasian citizens selected for *venire* and the proportion of eligible African-American citizens was above 20%. In the District of South Carolina, Caucasian citizens eligible to vote outnumbered eligible African-American citizens by two to one, and, therefore, the prospect of Caucasian citizens being selected for jury duty became even greater, and, correspondingly, the likelihood of African-American citizens being chosen for a particular jury was diminished. The defendant asserted that a predominantly Caucasian voting age population in the division at issue and a general history of societal discrimination argued for an exception to the general rule that voter lists provide a fair cross-section of the community for purposes of jury selection. The defendant argued that an exception should be made to the presumptive validity of voter lists as a source for the jury *venire* when the population eligible to vote in the district in question is predominantly Caucasian. Judge Williams, in denying this exception, held:

> We decline to carve an exception to the general test outlined in *Cecil* for districts that are racially disproportionate or which carry the same history of discrimination found throughout the South. Lewis offers neither evidence of current discrimination nor evidence of impediment of any group to register to vote. The unsupported exception urged by Lewis would be potentially without limits and would throw into question the integrity of a jury selection process that is universally accepted.

Id. at 1090.

Similarly, in <u>United States v. Cecil</u>, 836 F.2d 1431 (4th Cir. 1988), quoted in <u>Lewis</u>, the Fourth Circuit held:

> 1) The use of VRLs as the source for jury selection in federal courts has been expressly sanctioned by Congress in 28 U.S.C. § 1863(b)(2). In so doing Congress obviously recognized that such use would necessarily exclude from jury service those individuals, whatever their race, color, gender, or age, who had not registered to vote, but it determined that this use of the voter registration list or list of voters would meet the constitutional requirement of a "fair cross section" of the community, since no cognizable group would be systematically excluded. <u>Id.</u> at 1445.

2)  The Constitution does not require that juror selection process be a statistical mirror of the community.  Id.

3)  The Sixth Amendment affords criminal defendants the right to a juror selection process that draws from a fair cross-section of the community.  Id.

4)  [A] showing of mere statistical under representation, without evidence of actual discriminatory or exclusionary practices' [is] insufficient to establish "a *prima facie* violation of the sixth amendment fair cross-section requirement."  Id. at 1446.

5)  [t]hat use of current voter registration lists as the source for a jury pool from which random selection of jurors is made presumptively provides a fair cross-section, even if minorities are under represented on those lists, as long as there is no affirmative discrimination in registration.  Id. at 1448.

6)  Neither the statute nor the decisions provides any particular formula for determining whether there is a substantial discrepancy or not.  Judge Gewin states that the United States Commission on Civil Rights proposed that "any disparity of 20% or more between the proportion of eligible whites selected for master jury wheel and proportion of eligible minority persons selected be remedied by supplementation." 506 F.2d at 818.  Under this test the voter registration list in this case would not require supplementation since the number of black registrants substantially exceeded the 80% test.  Id. at 1453.

Counsel argues that he does not equate systemic with intentional.  Instead, he asserts "the jury *venire* selection process resulted in under representation of black jurors in the *venire* from which the grand jury which returned the indictment against Patrick Andrews operating to deny Patrick Andrews a jury composed of a fair cross-section of the community" (DE 200, p.1).  In support of his contention, he asserts statistics and numbers of African-American citizens in Braxton, Calhoun, Doddridge, Gilmer, Harrison, Pleasants, Marion, Monongalia, and Preston Counties.  It must be noted again that Andrews was indicted by a grand jury attending the Wheeling point or division of court and none of the aforementioned counties are part of that division.  Even when using the statistics from the Clarksburg division, Andrews does not identify those African American citizens

12

who are eligible for jury service versus those who would not be eligible. He uses the entire census of those who identify themselves as African American citizens. Not all African American citizens are eligible for jury service. Those eligible for jury service are those over eighteen (18) who are registered to vote or who have a driver's license.

Accordingly, the undersigned finds Andrews' calculations (DE 200, p. 3-5), based on the counties comprising the Clarksburg division of court, are not relevant to the issue posed with respect to the grand jury that indicted Andrews, and Andrews used faulty numbers in his calculations in support of his conclusions.

Andrews argued at the hearing that if Dr. Yang is retained, her statistical analysis may show that a more than 20 % disparity exists. He further argued such disparity is the result of using census numbers from the past election in conjunction with his unsupported social assumption that African-American citizens are more mobile than the other sectors of the population, and, because of their mobility, many African-American citizens would have moved without forwarding addresses or with forwarding addresses that expired and would not receive the summons or notice they were to appear for jury service. He contends such a showing constitutes a *prima facie* case of systemic exclusion, shifting the burden to the Government to prove random exclusion.

Andrews cites Berghuis v. Smith, 559 U.S. 314 (2010), as support for his theory that he need only provide some statistical support for his claim of systemic exclusion in order to shift the burden to the Government. In Berghuis, the defendant, Diapolis Smith, an African-American individual, was indicted and convicted of second degree murder in the State of Michigan. During the *voir dire* for his trial, the *venire* panel included sixty (60) to one hundred (100) individuals with, at most, three (3) being African-American citizens.

Prior to Smith's trial, Kent County, Michigan, used a system of assigning prospective jurors first to their local district courts' *venire*, and, after filling the district courts' needs, the county would assign the remaining prospective jurors to the circuit court. A month after *voir dire* for Smith's trial, Kent County changed its assignment order to have the circuit court filled first followed by the district courts, according to the Circuit Court Administrator, on "'[t]he belief . . . that the respective districts essentially swallowed up most of the minority jurors leaving the Circuit Court with a jury pool that 'did not represent the entire county.'"

On appeal, the Michigan Court of Appeals ordered the trial court to conduct an evidentiary hearing on Smith's fair cross-section claim. The trial court considered two (2) means of measuring the extent of under representation of African-American citizens on circuit court *venire*: "absolute disparity" and "comparative disparity." "Absolute disparity" is determined by subtracting the percentage of African-American citizens in the jury pool from the percentage of African-American citizens in the local, jury-eligible population. "Comparative disparity" is determined by dividing the absolute disparity by the group's representation in the jury-eligible population. This comparative disparity shows how less likely African-American citizens were to be selected, when compared to the overall jury-eligible population, to be on the jury-service list.

A final method is standard deviation. The analysis explains the probability that the disparity between the percentages of the African-American population in the relevant community and African-American prospective jurors in the qualified jury pool is a result of random chance. To determine this, courts first ascertain the standard deviation from the expected random allocation of jurors and then compare whether the disparity is beyond that standard deviation. Courts calculate the standard deviation by multiplying the number of prospective jurors in the jury pool by the percentage of the

distinct group in the population by the percentage of the population that is not in the distinct group, and then taking the square root of the product. The square root is the standard deviation. If the disparity is beyond that standard deviation, then the representation is not fair and reasonable.

The hearing convinced the trial court that African-American citizens were under represented in the circuit court *venire* but that Smith's evidence failed to prove that the juror-assignment order, or any other part of the jury-selection process, had systematically excluded African-American citizens. The intermediate appellate court reversed the trial court's judgment and ordered a new trial, and the Michigan Supreme Court, in turn, reversed, finding that the defendant had not established a *prima facie* violation on the fair cross-section requirement.

The defendant then filed a *habeas corpus* petition in the United States District Court reasserting his fair cross-section claim. The District Court dismissed Smith's petition. The Court of Appeals reversed the decision. The Sixth Circuit ruled that, when the alleged group is small, courts should employ the comparative disparity test to measure under representation and found that Kent County's jury-assignment order significantly reduced the number of African-American citizens available for circuit court *venires*. In reversing the Sixth Circuit, the Supreme Court, with Justice Ginsburg writing for the majority, held:

1)      As the Michigan Supreme Court correctly observed, see *supra*, at 1390, neither Duran nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools. Id. at 329.

2)      Each test is imperfect. Absolute disparity and comparative disparity measurements, courts have recognized, can be misleading when, as here, "members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service." Smith, 463 Mich., at 203-204, 615 N.W.2d, at 2-3 (2000). And to our knowledge, "[n]o court . . . has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment

challenges to jury selection systems." <u>United States v. Rioux</u>, 97 F.3d 648, 655 (C.A.2d 1996). <u>Id.</u>

3)    [W]e would have no cause to take sides today on the method or methods by which under representation is appropriately measured. <u>Id.</u> at 329-30.

4)    Smith's evidence gave the Michigan Supreme Court little reason to conclude that the district-court-first assignment order had a significantly adverse impact on the representation of African-Americans on Circuit Court *venires*. <u>Id.</u> at 331.

5)    To establish systematic exclusion, Smith contends, the defendant must show only that the under representation is persistent and "produced by the method or 'system' used to select [jurors]," rather than by chance. . . . No "clearly established" precedent of this Court supports Smith's claim that he can make out a prima facie case merely by pointing to a host of factors that individually or combination, *might* contribute to a group's under representation. <u>Id.</u> at 332.

<u>Berghuis v. Smith</u> cites the earlier decision of <u>Duren v. Missouri</u>, 439 U.S. 357 (1979). In <u>Duren</u>, the defendant was convicted for first-degree murder and first-degree robbery. The jury was all male. In his motion for a new trial, he contended that his right to trial by a jury chosen from a fair cross section of his community was denied by provisions of Missouri law granting women, who so request, an automatic exemption from jury service. At the time of trial, 54% of adult inhabitants in Jackson County were women. Of those women, 26.7% were summonsed and, of those summonsed, only 14.5% of the persons on the post-summons weekly *venire,* during the period in which his jury was chosen, were female. Reversing and remanding, the Court, with Justice White writing for the majority, held:

In order to establish a *prima facie* violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in *venires* from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

Id. at 364.

There is no issue and the Government concedes that Andrews satisfies the first prong of the Duren test. African-American citizens constitute a distinctive group in the community. Id.

With respect to the second prong of the Duran test, Andrews argued at the hearing that if Dr. Wang is retained, her statistical analysis may show that more than 20 % disparity exists. He argued at the hearing that by using more sophisticated statistical analysis (chi squared test), under representation would be 86% to 87%.

Analysis of this prong must start with the number of African-American citizens available to serve on the *venire* from which the grand jury indicting Andrews was selected. In United States v. McGrady, 173 F.3d 426 (4th Cir.1999) (per curiam), the Fourth Circuit noted the proper analysis should focus on those individuals eligible for jury service. Before trial, the defendants unsuccessfully argued that the racial composition of the jury *venire* denied them a fair trial and they were subsequently convicted of conspiracy. In the division where the case was tried, African-American citizens comprised 4.9% of the general population and 3.47% of the registered voters. Between January and July 1995, only two (2) African-American citizens were present on four *venires*. The defendants argued that this statistical data demonstrates that African-American citizens were systematically excluded from jury *venires* in that division. In rejecting this claim, the Fourth Circuit held:

1)      Nor does the fact that African-Americans comprised only 1.25 percent of the jurors on four random *venires* demonstrate that the exclusion of minorities was due to the sort of discriminatory "system" outlawed in Taylor and Duran.

2)      [E]ven assuming there is an unfair or unreasonable representation of African-Americans in jury *venires*, the lack of African-Americans in the four jury *venires* is not due to any 'systematic' exclusion. Rather, the lack of African-

Americans constitutes less than four percent of the population eligible to serve on juries. Appellants' proof that four jury panels contained proportionally fewer African-Americans than were eligible for jury duty is insufficient evidence that North Carolina "systematically" or "intentionally" excludes African-Americans by its procedure.

In the instant case, based on the "Source List Race/Gender Report Processed Questionnaires - Division: 5," prospective *venire* for the Wheeling point of court, between August 2009, and July 2013, from which the 2012 Wheeling grand jury was selected, included thirty (30) African-American citizens, or 0.69% of the total available *venire* (4,345) for that point of holding court. "[A] disparity of 0.5% in the jury pool does not provide proof that a group is not fairly and reasonably represented in the jury *venire* because 0.5% is a *de minimus* variation." United States v. Jones, 469 F. App'x 175 (2012) (per curiam)[2]. Andrews does not provide any statistics showing the actual 2009-2013

_____

[2]In Jones, the defendant's jury *venire* included just one African-American juror and the initial jury panel viewed by Jones had no African-American jurors. The defendant chose a bench trial and, in the end, the composition of the jury *venire* did not prejudice Jones. The Court, for the sake of argument, found that even if Jones had a jury trial, his argument that the jury "wasn't a jury of his peers" would still fail. The Court looked at the second *Duran* factor "that the representation of this group, in *venires* from which juries are selected, is not fair and reasonable in relation to the number of such persons in the community" and held:

Unfortunately for Jones, though, we are unable to find any merit in his claim "that the representation of this group in *venires* from which juries are selected is not fair and reasonable in relation to the number of such persons in the community[.]" quoting Duran v. Missouri, 99 S.Ct. 664 (1979). As noted by the government, Jones avers that approximately 3.2% of West Virginia residents are African-American. Yet, 2.7% of the jury *venire* was African-American. We cannot say that this mere half of a percentage point difference in any way demonstrates that Jones's *venire* was "not fair and reasonable in relation to the number of such persons in the community[.]" "To allow [Jones] to substitute evidence of [*de minimus*] under representation for evidence of systematic exclusion would go a long way towards requiring perfect statistical correspondence between racial percentages in the venire and those in the community. Such a rule would exalt racial proportionality over neutral jury selection procedure." quoting Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir.1998).

18

populations of the counties comprising the Wheeling division. Andrews does not provide any statistics showing the actual 2009-2013 population of African-American citizens in the counties comprising the Wheeling division. Moreover, Andrews does not provide any statistics showing the number of African-American citizens in the counties comprising the Wheeling division between 2009-2013 that were eligible for jury service (registered to vote or licensed). In the absence of such statistics, for purposes of the motion, neither Andrews nor the Court has sufficient statistics to calculate absolute disparity, to calculate comparative disparity, or to calculate standard deviation.

"'[M]ere statistical under representation, without evidence of actual discriminatory or exclusionary practices' [is] insufficient to establish 'a *prima facie* violation of the sixth amendment fair cross-section requirement.'" Cecil, *supra* at 1446. There is no requirement that grand juries "actually chosen must mirror the community and reflect the various distinctive groups in the population." The law is clear that defendants "are not entitled to a jury of any particular composition." All that is required is that "jury wheels, pools of names, panels, or *venires* from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor, *supra* at 538. It must therefore be concluded that Andrews cannot and has not met the second prong of Duran.

Congress expressly sanctioned the use of voter registration lists as the source for jury selection in federal courts, recognizing "that such use would necessarily exclude from jury service those individuals, whatever their race, color, gender, or age, who had not registered to vote." 28 U.S.C. § 1863(b)(2). In so doing, Congress "determined that this use of the voter registration list or list of voters would meet the constitutional requirement of a 'fair cross section' of the community, since no cognizable group would be systematically excluded." Cecil, *supra* at 1445.

Notwithstanding this recognition by Congress, Andrews now argues the disparity he believes Dr. Yang would find is the result of using census numbers from the past election in conjunction with defense counsel's unsupported assumption that African-American citizens are more mobile than the other sectors of the population, and, that because of their mobility, many African-American citizens would have moved without forwarding addresses or with forwarding addresses that expired and would not receive the summonses or notices they were to appear for jury service. He contends such a showing constitutes a *prima facie* case of systemic exclusion, shifting the burden to the Government to prove random exclusion.

Andrews' argument is not supported by the law. At best, Andrews' assumptions support claim of passive exclusion, not systematic exclusion or active discrimination. While not binding, the Fourth Circuit's unpublished opinion in United States v. Peoples, 70 F.3d 113 (4th Cir. 1995), is instructive. The Court rejected Peoples' claim that he was denied a jury selected from a fair cross-section of the community. Peoples contended that, absent exclusion, there would have been African-American citizens on his jury. There were none. The Court held: "Peoples must show that the under representation of African-Americans was due to systematic exclusion in the jury-selection process. . . . Proof of under-representation in a particular panel or *venire* is not sufficient. The Constitution requires only that the cross-section is gathered without active discrimination. . . . Because Peoples has made no showing of active discrimination, the claim is meritless." Id. at *1 (internal citations omitted).

V.
Recommendation

For the reasons herein stated, it cannot be in good conscience be recommended that scarce

resources be allocated the retention of Dr. Fang Yang in support of a motion which has no chance of being granted when Andrews cannot show, and admits he cannot show, that: 1) the system in use for filling the jury *venire* in the Northern District of West Virginia was designed to exclude or limit participation by African-American citizens or 2) the system in use for filling the jury *venire* in the Northern District of West Virginia is being manipulated by humans administering it to exclude or limit participation by African-American citizens. Inasmuch as Andrews' Motion To Dismiss Violation of Sixth Amendment Right to a Jury Composed of Fair Cross-Section of Community Claim (DE 200) is based on the theory of under representation of African-American citizens on the grand jury that indicted him, it has no chance of success for the same reasons his *Ex Parte* Motion For Permission To Employ Expert (DE 291) has no chance of success and may be disposed of without further hearing.

It is, therefore, **RECOMMENDED** that Defendant Patrick Andrews' *Ex Parte* Motion For Permission To Employ Expert (DE 291) and Defendant's Motion To Dismiss Violation of Sixth Amendment Right to a Jury Composed of Fair Cross-Section of Community Claim (DE 200) be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Memorandum Opinion, Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Memorandum Opinion, Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Memorandum Opinion, Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Memorandum Opinion, Report and

Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed provide electronic notification of this Memorandum Opinion, Report and Recommendation to counsel of record.

DATED: June 12, 2014

*John S. Kaull*
**JOHN S. KAULL**
**UNITED STATES MAGISTRATE JUDGE**