# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,
        Plaintiff,

v.                                                                                             Criminal Action No. 1:12-cr-100-1

PATRICK FRANKLIN ANDREWS,
        Defendant.

## REPORT AND RECOMMENDATION

This matter is before the Court pursuant to Defendant Patrick Franklin Andrews' "Motion to Dismiss Indictment or, Alternatively, to Dismiss United States' Notice of Intent to Seek Death Penalty as to Defendant Patrick Franklin Andrews," filed on December 13, 2013. (Docket No. 202.) The Government filed its response on February 14, 2014. (Docket No. 272.) Andrews filed a reply on February 26, 2014. (Docket No. 276.) This matter was referred to the undersigned by United States District Judge Irene M. Keeley on January 29, 2014. (Docket No. 253.) On September 15, 2014, came Andrews, by counsel Harry J. Trainor and Stephen Herndon, and came the United States by Andrew Cogar, Assistant United States Attorney, and Richard E. Burns, for a hearing on, inter alia, the instant motion. Prior to the hearing, the undersigned granted Andrews' motion requesting his waiver of appearance at the motions hearing. (Docket Nos. 514, 516.) The Court heard the testimony of Special Investigative Services ("SIS") Lieutenant Robert Poissonier.

### I.    Relevant Procedural and Factual History

On October 7, 2007, Jesse Harris, an inmate at USP Hazelton in Bruceton Mills, West Virginia, was stabbed to death. The incident occurred near the gate connecting the yellow and blue corridors of the prison. Prison staff observed co-defendant Kevin Bellinger attacking Harris. They chased Bellinger and apprehended him in the yellow corridor. Staff later reviewed prison

surveillance video from the Vicon video system and identified Andrews as a second assailant of Harris. Prison staff went to the B-2 housing unit, where Andrews was held, and took him into custody at his cell.

Subsequently, prison staff conducted an investigation into the death of Harris. This investigation was supervised by SIS and the FBI. The investigation took three general procedural routes: (1) use of prison staff to interview each of the 1,200 inmates at the prison for approximately 10 minutes to determine whether they had anything to say; (2) securing selected video from the prison video surveillance system; and (3) SIS and FBI interrogation of Andrews.

Relevant to the video surveillance system, Lieutenant Poissonier testified that there are approximately four hundred (400) motion-activated cameras that cover the grounds of USP Hazelton. Video is automatically recorded and is stored for a period of time dependent on the amount of data contained on each camera feed. Such video can be archived to be kept indefinitely; SIS is responsible for archival of video. Not all video from the cameras covering areas such as the recreation yard and the yellow and blue corridors was preserved. Lieutenant Poissonier testified that preserving video is relatively simple, and the Government proffered that video could have been transferred to a hard drive for preservation. The Government also stated that any video from the time of the incident that had not been preserved would have been overwritten anywhere between thirty (30) days and six (6) months after October 7, 2007.

On August 1, 2008, the Federal Public Defender for the Northern District of West Virginia filed an application for appointment of counsel for Andrews, stating that Andrews "may be subject to a federal death penalty prosecution but is not yet charged by complaint or indictment." (Docket No. 1.) The undersigned granted the application and appointed Harry J. Trainor as counsel for

Andrews. (Docket No. 3.) Stephen Herndon was appointed as co-counsel on August 25, 2008. (Docket No. 4.) Subsequently, several items of discovery were provided, including video surveillance from the time of Harris' murder.

On October 13, 2008, Mr. Herndon sent a letter to the Warden at USP Hazelton and the Assistant United States Attorney then assigned to the case. In that letter, he requested that the government "preserve all videotape and/or audiotape or other recordings of events in the Blue Corridor, the Yellow Corridor, the Red Corridor, and the outside recreation area for 12 hours on each side of the events on or about October 7, 2007 leading to Mr. Andrews being placed in the SHU." (Docket No. 202 at 27.) On November 3, 2008, defense counsel sent a detailed five-page evidence preservation demand to the United States Attorney's Office, requesting that all evidence and video, including a list of specific items, be retained. (Id. at 21-25.)

On March 10, 2010, Andrews and the Government reached a conditional plea agreement, subject to the approval of the United States Attorney General. On August 2, 2010, counsel for Andrews appeared before the Attorney General's Committee for the Review of Capital Cases to discuss the conditional plea agreement and to advocate for a non-capital disposition. Thirteen months later, on September 2, 2011, defense counsel were notified that the Attorney General had directed the Government to seek the death penalty for Andrews if and when an Indictment was returned for the October 7, 2007 death of Harris.

On October 2, 2012, a Grand Jury returned an Indictment against Andrews and Bellinger, charging them with aiding and abetting murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. §§ 2, 1111(a), and 1118, and second degree murder, in violation of 18 U.S.C. §§ 2, 7(3), and 1111(a) and (b). (Docket No. 41.) The Grand Jury returned a "Notice of Special

Findings" as to Andrews with respect to Count One. Of particular note are paragraphs (g), (h), and (i) of the Notice within Count One of the Indictment.[1] The Government contends these convictions, if proved, are aggravating circumstances which justify imposition of the death penalty should Andrews be convicted of the substantive offense charged in Count One. See 18 U.S.C. § 3592(c)(2)-(4). On October 23, 2012, the Government filed a Notice of Intent to Seek the Death Penalty ("Notice") as to Andrews. (Docket No. 46.) Such Notice mirrored the Notice of Special Findings contained in the Indictment.

On December 7, 2012, Judge Keeley designated this case as complex. (Docket No. 68.) On November 26, 2013, Judge Keeley granted the defendants' motions to sever. (Docket No. 192.) On October 7, 2013, Bellinger filed a motion to dismiss the Indictment due to pre-indictment delay. (Docket No. 145.) In that motion, Bellinger argued that the delay between October 7, 2007, and October 2, 2012 had made him "unable to conduct a meaningful and complete investigation." (Id. at 4.) Specifically, Bellinger argued that most of the potential witnesses were no longer within the Northern District of West Virginia, that many of the inmates at USP Hazelton at the time of the incident had since been transferred, that other inmates who observed the incident now either refused to cooperate or no longer had clear memory of the events, and that exculpatory video evidence had been discarded. (Id. at 4-6.)

---

[1] These paragraphs state as follows: "(g) has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person (18 U.S.C. Section 3592(c)(2)); (h) has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute (18 U.S.C. Section 3592(c)(3)); (i) has previously been convicted of two or more Federal or State offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. Section 3592(c)(4))."

A day later, Andrews moved to join and adopt Bellinger's motion to dismiss. (Docket No. 148.) On November 4, 2013, Judge Keeley entered an Order granting Andrews' motion to join and adopt Bellinger's motion insofar as it was procedural only. (Docket No. 171.) Her ordered stated, in pertinent part:

> First, the arguments advanced by Andrews as to the motion to dismiss are circumscribed by those raised by Bellinger in his motion. While this does not limit Andrews to the specific phrases or cases from Bellinger's motion, it does foreclose any arguments that were not advanced by Bellinger. Second, by adopting Bellinger's motion, Andrews defaults on any issues unique to him (e.g., standing, prejudice, etc.) that could arise during the Court's consideration of the motion to dismiss. Under these conditions, the Court **GRANTS** Andrews' motion to adopt Bellinger's motion to dismiss.

(Id. at 2-3.)

At a motions hearing held on November 8, 2013, the undersigned directed the Government to "attempt to locate the laptop computer previously assigned to FBI case agents investigating the instant matter." (Docket No. 198 at 1.) At the hearing, counsel for Andrews and Bellinger "raised concerns about the existence of prison surveillance video that may have previously existed, but has not been disclosed." (Id.) On December 4, 2013, the Government advised the Court that the laptop in question, including the hard drive, had been destroyed on or about January 23, 2012. (Docket No. 198-1 at 2.)

Andrews filed the instant motion on December 13, 2013. (Docket No. 202.) On March 28, 2014, he filed a "Notice of Withdrawal of Motion to Join and Adopt Co-Defendant's Motion to Dismiss Indictment Due to the Government's Extraordinary Pre-Indictment Delay." (Docket No. 316.) The undersigned held a hearing on several motions, including Bellinger's motion to dismiss, on March 31, 2014. At that time, Andrews maintained his desire to withdraw from his previous

5

joinder of Bellinger's motion. On April 4, 2014, the undersigned entered a Report and Recommendation ("R&R") recommending that Bellinger's motion to dismiss be denied because he had failed to meet his burden of demonstrating actual prejudice caused by any pre-indictment delay. (Docket No. 326.) Bellinger filed objections on April 18, 2014. (Docket No. 340.)

On April 23, 2014, Judge Keeley entered an Order overruling Bellinger's objections, adopting the R&R, and denying Bellinger's motion to dismiss. (Docket No. 345.) In that Order, she specifically stated:

> Bellinger points to two examples of prejudice. First, he argues that, during the delay, the Government discarded "critical exculpatory video evidence," which depicted him discussing his drug involvement with three other inmates. According to an FBI report, on the day of the murder, Bellinger and his cohorts conversed about Harris's refusal to continue supplying drugs, and his interlocutors encouraged him to take care of the problem "just like it would be taken care of on the street." Bellinger argues that the video might have shown that no such discussion ever occurred, thus undermining the Government's theory of motive. Highly speculative allegations of prejudice such as this are, of course, insufficient to warrant dismissal of the indictment. Moreover, even if Bellinger were correct as to what the video depicted, the Court cannot find that the disposition of his trial would likely be affected.
>
> Bellinger's second argument focuses on his purported inability to "identify, locate, and interview many of the eyewitnesses due to the passage of time." . . . Here, Bellinger alleges his inability to interview seventy potential eyewitnesses; however, he does not name these witnesses, and concedes he has no knowledge of what their testimony might be. Angelone clearly requires a level of specificity and concreteness that Bellinger has failed to satisfy.

(Id. at 4-6.)

On June 16, 2014, following a week-long jury trial, Bellinger was found guilty of both counts of the Indictment. (Docket No. 486.) Trial for Andrews is scheduled to commence with jury selection on May 4, 2015. (Docket Nos. 244, 254.)

6

## II. Contentions of the Parties

**A.    Andrews' Motion (Docket No. 202)**

In his motion, Andrews seeks the dismissal of the Indictment or, alternatively, the Notice of Intent to Seek the Death Penalty, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution. In support of his motion, he asserts that his defense team "has suffered substantial, actual prejudice" because of the "government's five-year delay in prosecuting this case." (Docket No. 202 at 6.) Andrews states that his legal team has suffered the following prejudice:

1. Video "in at least two key areas of USP-Hazelton was not preserved by the government and is no longer recoverable";

2. The defense has no way of identifying a key group of witnesses who passed by the scene of the incident on October 7, 2007;

3. Inmate-witnesses have been transferred to other federal institutions, have been released from federal custody, or have died, creating "meaningful impairment" to Andrews' ability to defendant against the charges;

4. Some inmate-witnesses who previously agreed to cooperate with defense are now stating that they are no longer interested in cooperating or that "passage of time has dimmed their memory" of events;

5. At least one the Emergency Medical Technicians ("EMTs") who transported Jesse Harris to Ruby Memorial Hospital cannot be located, impairing Andrews' ability to present a theory of mitigation that includes "arguments that the delay in transporting Mr. Harris to the hospital contributed to his demise": and

6. The Government has destroyed various items requested by the defense in its November 3, 2008, Evidence Preservation Demand.

(Id. at 6-12.) Andrews further asserts:

> Given the Evidence Preservation Demand, the heightened standard of reliability required, and the clear impairment to the defense function, particularly meaningful in the capital aspects of the defense function, caused by the loss or destruction of evidence, the government cannot now credibly claim that the loss or destruction of

7

evidence was inadvertent or that the loss is simply not harmful to the defense.

(Id. at 16-17.) Andrews also argues that his Sixth Amendment right to a speedy trial has been violated. (Id. at 17.)

**B.     Government's Response (Docket No. 272)**

In its response, the Government asserts that Andrews' motion should be denied because:

1. Andrews' motion contains additional arguments not made by co-defendant Bellinger, in violation of the previous Order entered by Judge Keeley;

2. The "heightened reliability" requirement for capital cases only applies to capital sentencing procedures, not every aspect of a capital case; and

3. Andrews has not provided any example of how his ability to present mitigation evidence has been impaired.

(Docket No. 272 at 1-4.) The Government also relies on its previous response to co-defendant Bellinger's motion to dismiss, in which it argued that the defendants had failed to demonstrate how the movement of witnesses and the destruction of potentially exculpatory video caused substantial, actual prejudice to their defense. (Docket No. 153 at 4-6.)

**C.     Andrews' Reply (Docket No. 276)**

In his reply, Andrews argues:

1. The Government's contention that his motion was filed in contravention of Court order "is simply not founded in fact or based in reality";

2. The Government has not addressed Andrews' argument that the Notice of Intent to Seek the Death Penalty should be dismissed; and

3. The Government has not explained how lengthy delays, movement of witnesses, and destruction of evidence "can be fairly and factually justified as being part of the government's diligent decision process."

(Docket No. 276 at 2-4.)

## III. Analysis

### A. Due Process

It is well established that pre-indictment delay can potentially violate a criminal defendant's due process rights. See United States v. Lovasco, 431 U.S. 783, 788-89 (1977); United States v. Marion, 404 U.S. 307, 324-25 (1971); United States v. Daniels, 698 F.2d 221, 223-24 (4th Cir. 1983). As the Fourth Circuit has noted, "'[T]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Shealey, 641 F.3d 627, 633 (4th Cir. 2011) (alteration in original) (quoting Marion, 404 U.S. at 324).

The Fourth Circuit has created a two-pronged inquiry for evaluation of a claim that pre-indictment delay has violated a defendant's due process rights. First, a court must "ask whether the defendant has satisfied his burden of proving 'actual prejudice.'" United States v. Uribe-Rios, 558 F.3d 347, 358 (4th Cir. 2009) (quoting United States v. Auto. Med. Labs, Inc., 770 F.2d 399, 403 (4th Cir. 1985)). The defendant's burden of demonstrating actual prejudice is heavy because "not only [must he] show actual prejudice, as opposed to mere speculative prejudice, but . . . he [must also] show that any actual prejudice was substantial–that he was meaningfully impaired in his ability to defend against the charges to such an extent that the disposition of the criminal proceedings was likely affected." Jones v. Angelone, 94 F.3d 900, 907 (4th Cir. 1996). If the defendant meets that threshold, the court must then "consider the government's reasons for the delay, 'balancing the prejudice to the defendant with the Government's justification for delay.'" Uribe-Rios, 558 F.3d at 358 (quoting Auto. Med. Labs, Inc., 770 F.2d at 404.) Accordingly, the "basic inquiry then becomes

9

whether the Government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" Auto. Med. Labs, Inc., 770 F.2d at 404 (quoting Lovasco, 431 U.S. at 790).

The Fourth Circuit has also provided guidance on how to evaluate a defendant's claim that his due process rights have been violated by pre-indictment delay because the unavailability of witnesses has created prejudice. In this situation,

> courts have generally required that the defendant identify the witness he would have called; demonstrate, with specificity, the expected content of that witness's testimony; establish to the court's satisfaction that he has made serious attempts to locate the witness; and, finally, show that the information the witness would have provided was not available from other sources. Jones, 94 F.3d at 908 (citations omitted).

"Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice" resulting from pre-indictment delay. United States v. Jenkins, 701 F.2d 850, 855 (10th Cir. 1983); see also United States v. Galardi, 476 F.2d 1072, 1075 (9th Cir. 1973) ("The assertion that a missing witness might have been useful does not show the 'actual prejudice' required by Marion.").

### 1. Law of the Case

Like Bellinger did previously, Andrews asserts that because of the Government's delay, his defense team has not been able to identify, locate, and interview eyewitnesses to Harris' murder. (Docket No. 202 at 7-8.) He also alleges that eyewitnesses have been transferred to other federal institutions, have been confirmed dead, or have been released. (Id. at 9.) Furthermore, he argues that some eyewitnesses who have previously agreed to assist the defense are no longer interested in cooperating, and some have stated that the passage of time has dimmed their recollection of Harris'

death. (Id. at 10.)

As noted above, Judge Keeley dismissed Bellinger's argument as to the inability to locate eyewitnesses. The Fourth Circuit has described the law of the case doctrine as follows:

> "A [sic] most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." . . . Furthermore, when a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue. . . . Under the law of the case doctrine, as a practical matter, once the "decision of an appellate court establishes 'the law of the case,' it 'must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'"

United States v. Aramony, 166 F.3d 655, 661 (1999) (internal citations omitted).

Here, Andrews, like Bellinger, has not explained why he was unable to identify, locate, and interview potential witnesses in the approximate four years that passed from when video was disclosed to defense counsel and when Andrews was indicted. Like in Bellinger's case, the fact remains that Andrews has failed to: (1) present the Court with the identities of potential witnesses; (2) demonstrate the "expected specificity" of their testimony; (3) establish that he made serious attempts to locate those witnesses; and (4) show that the information that these witnesses would have provided is unavailable from other sources. Jones, 94 F.3d at 907. Andrews does indicate that information gleaned from eyewitnesses may have been useful to his defense; however, such an assertion is insufficient to demonstrate actual prejudice. See Galardi, 476 F.2d at 1075. Given that Judge Keeley has already dismissed Bellinger's substantially similar argument, the undersigned finds that the law of the case doctrine must apply to dismiss Andrews' argument as well. See Aramony, 166 F.3d at 661.

Furthermore, like Bellinger, Andrews argues that "[v]ideo that is critically important to the defense theory of this case in at least two key areas of USP-Hazelton was not preserved by the government and is no longer recoverable." (Docket No. 202 at 6-7.) At the hearing, counsel for Andrews proffered that such video would have depicted Harris, the victim, walking through the recreation yard to Andrews, challenging Andrews, and walking back along the same path. In addition, during the hearing counsel for Andrews proffered that: 1) preserved video shows Harris coming from the blue corridor side through the yellow corridor past the recreation yard to the red corridor and disappearing from view; 2) Harris is next seen coming in the opposite direction in the red corridor toward the yellow corridor; 3) this movement by Harris was prior to him going to the recreation yard; 4) Harris was housed in the cell unit off of the blue corridor; 5) Andrews was housed in the cell unit off of the red corridor; and 6) there was no reason for Harris to go out the red corridor toward the cell unit unless he was going there to confront Andrews. Counsel stated that some witnesses have stated that this occurred and that there was a confrontation by Harris with Andrews at the entrance to the cell unit where Andrews was housed. However, counsel admits they have no video evidence to corroborate those statements. The reason for there being no video evidence to corroborate this movement and alleged confrontation is the failure of the BOP SIS agents to preserve the video showing Harris at the entrance to the cell unit where Andrews was housed off of the red corridor. The undersigned notes that tracking potential witnesses may be problematic given the selective preservation of video from the Vicon surveillance system. The undersigned notes further that the information revealed during the hearing by proffer, even though not refuted by the United States, does not raise the alleged confrontation beyond speculation. Additionally, the same information is available through witnesses counsel for Andrews proffered the defense team has. The

undersigned further finds that there is no evidence offered which shows that the United States by the SIS or FBI intentionally failed to preserve the video showing movement of Harris toward the entry to the housing unit off the red corridor for some tactical advantage or other improper purpose. Moreover, defense counsel admitted during the hearing that the government does not have the video evidence available to it to refute the testimony of witnesses who may be called to prove such a confrontation or threat took place between Harris and Andrews at the entrance to the red side housing unit.

In denying Bellinger's motion to dismiss, Judge Keeley wrote:

> Highly speculative allegations of prejudice such as this are, of course, insufficient to warrant dismissal of the indictment. Moreover, even if Bellinger were correct as to what the video depicted, the Court cannot find that the disposition of his trial would likely be affected.

(Docket No. 345 at 4-5.) Given this, the undersigned finds that the law of the case must apply to dismiss Andrews' argument regarding video evidence as well. See Aramony, 166 F.3d at 661.

### 2. Remaining Arguments

In his motion, Andrews asserts that the "defense theory of mitigation includes arguments that the delay in transporting Mr. Harris to the hospital contributed to his demise." (Docket No. 202 at 11.) The defense team "recently" received discovery disclosing the identity of the EMTs who provided care to Harris and transported him to Ruby Memorial Hospital. According to Andrews, during the "period of delay" at least one of the EMTs "has left the area and cannot now be located." He asserts that the "loss of this key witness due to late disclosure and unreasonable delay has greatly impaired the ability of the defense to fully present a theory of mitigation during the penalty phase of these proceedings." (Id.) At the hearing, defense counsel proffered their theory that Harris would

13

have survived had he been transported to the hospital in a more timely manner. Again, Andrews has failed to: (1) present the Court with the identity of this potential witness; (2) demonstrate the "expected specificity" of this EMT's testimony; (3) establish that he has made serious attempts to locate the EMT; and (4) show that the information that the EMT would have provided is unavailable from other sources. Jones, 94 F.3d at 907. Put simply, Andrews' assertion that information received from the EMT may have been useful to his defense is not sufficient to demonstrate actual prejudice. See Galardi, 476 F.2d at 1075.

Andrews also asserts that the Government ignored his counsel's November 3, 2008 Evidence Preservation Demand. Specifically, he states that the following items have either been destroyed or not retained: housing unit shakedown logs; the Board of Inquiry report for Harris' death; Institutional Character Profiles for USP Hazelton for years 2005, 2006, 2007, and 2009; location, calibration, and inspection logs for walk-through metal detection devices; visual search logs; correctional services quarterly audit reports and work papers; and Report of Incident–583s. (Docket No. 202 at 11-12.) Andrews states further:

> It appears clearly now that the government simply ignored the November 3, 2008 demand made by defense counsel. Given the Evidence Preservation Demand, the heightened standard of reliability required, and the clear impairment to the defense function, particularly meaningful in the capital aspects of the defense function, caused by the loss or destruction of evidence, the government cannot now credibly claim that the loss or destruction of evidence was inadvertent or that the loss is simply not harmful to the defense.

(Id. at 16-17.) The Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988). At no time has Andrews demonstrated any bad faith on the part of the Government. Accordingly, the undersigned finds that

14

his argument regarding the November 3, 2008 Evidence Preservation Demand is without merit.

In his motion, Andrews asserts that "[a] pre-indictment/pre-death notice delay of this magnitude is truly 'unusual' in the Eighth Amendment sense, and is much longer than would be normally sanctioned by the court in the federal system." (Docket No. 202 at 12.) The Supreme Court has stated that "[i]n capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened sense of reliability. . . . This especial concern is a natural consequences of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Ford v. Wainwright, 477 U.S. 399, 411 (1986). Nevertheless, neither party has provided, and the undersigned has not located, any case suggesting that pre-indictment delay in a capital case violates the "heightened reliability" principle. Indeed, Andrews' argument is inherently contradictory. On one hand, he argues that every step of a capital case requires extra diligence; on the other, he complains that the Government's exercise of such diligence, including review by the Attorney General, delayed the Indictment.

In sum, the undersigned finds that Andrews has failed to meet his heavy burden of proof of demonstrating that the passage of time between when Harris' death occurred and when the Indictment was lodged caused actual prejudice to his defense. See Uribe-Rios, 558 F.3d at 358. Indeed, Andrews has not shown that "he was meaningfully impaired in his ability to defend against the charges to such an extent that the disposition of the criminal proceedings [would] likely [be] affected." Jones, 94 F.3d at 907 (alterations in original). Accordingly, because Andrews has failed to meet his burden under the first prong of the Uribe-Rios analysis, the undersigned does not "consider the government's reasons for the delay, 'balancing the prejudice to the defendant with the

Government's justification for delay.'"² Uribe-Rios, 558 F.3d at 358 (quoting Auto. Med. Labs, Inc., 770 F.2d at 404).

**B.      Sixth Amendment Speedy Trial Right**

Andrews also argues that his Sixth Amendment right to a speedy trial has been violated because of the period of time that has passed since October 7, 2007, when Harris was killed, until October 2, 2012, when the Indictment was returned, and October 23, 2012, when the Notice was filed. (Docket No. 202 at 17.)

To establish a violation of this right, "a defendant must show first that the Amendment's protections have been triggered by 'arrest, indictment, or other official accusation.'" United States v. Thomas, 55 F.3d 144, 148 (4th Cir. 1995) (quoting Doggett v. United States, 505 U.S. 647, 655 (1992)). There are four factors used to determine whether the Sixth Amendment right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (3) the extent of prejudice to a defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). The defendant has the burden of demonstrating that Barker's four factors weigh in his favor. Shealey, 641 F.3d at 634.

Length of the delay is a threshold issue, and inquiry as to the other factors need not be made if there is not delay that is presumptively prejudicial. United States v. Schreane, 331 F.3d 548, 553 (6th Cir. 2003) (citing Barker, 407 U.S. at 530). To determine whether a delay is presumptively prejudicial, courts must determine whether it is uncommonly long or extraordinary. Doggett, 505 U.S. at 651-52. Here, the undersigned find that Andrews' Sixth Amendment right was triggered

---

² Nevertheless, there is no evidence that the Government deliberately delayed in seeking an Indictment against Andrews.

when he was taken into custody and placed in the SHU for Harris' murder on October 7, 2007. Almost five years passed between that date and October 2, 2012, when the Indictment was returned. Given this, the undersigned finds that the delay between Andrews' arrest and the return of the Indictment was uncommonly long. See id. at 652 n.1 ("[T]he lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year. . . . We note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker inquiry."). Accordingly, the undersigned will consider the remaining factors under Barker.

Nowhere in the record is there any indication that Andrews has ever asserted his right to a speedy trial. Indeed, on November 20, 2012, after the Indictment had been returned, his counsel filed a "Motion to Designate Case as Complex and for Modification of Initial Scheduling Order." (Docket No. 57.) That motion was granted by Judge Keeley on December 7, 2012. (Docket No. 68.) On April 25, 2014, Andrews' counsel filed a "Motion to Suspend and Modify Pretrial and Trial Scheduling Order Filed 01/29/14." (Docket No. 349.) That motion was denied by Judge Keeley on September 30, 2014. (Docket No. 529.) Rather than assert his right to a speedy trial, it appears that Andrews has attempted to have his trial date moved further into the future. The failure to assert the right to a speedy trial, and even the explicit waiver of that right, is not dispositive of a Sixth Amendment speedy trial claim. See Barker, 407 U.S. at 528-30. However, it is a factor in determining whether the defendant's right has been violated, see id. at 530, 531-32, and "the failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial," id. at 532. Accordingly, the undersigned finds that the assertion-of-right factor weighs heavily

17

against Andrews' claim.

After reviewing the record, the undersigned finds that the Government had plausible reasons for the delay. In 2009, counsel began to negotiate with the Government regarding disposition. In March 2010, Andrews and the Government reached a conditional plea agreement, subject to approval by the United States Attorney General. On August 2, 2010, counsel appeared before the Attorney General's Committee for the Review of Capital Cases to discuss the proposed conditional plea agreement and to advocate for a non-capital disposition. On September 2, 2011, counsel learned that the Attorney General had directed the Government to seek the death penalty against Andrews if and when an Indictment was returned. While this period does not cover the entire period of time between October 7, 2007, and October 2, 2012, the undersigned finds that it covers a substantial portion of it. Furthermore, given Andrews' inherently contradictory argument regarding the "heightened reliability" standard, the undersigned finds that the Government should not be faulted for conducting a thorough investigation and review before seeking to indict.

Given these findings, the undersigned finds that while Defendant has experienced presumptive prejudice, he has not demonstrated that any actual prejudice exists. Accordingly, the undersigned finds that the Barker analysis favors the Government, and that Andrews' claim that his right to a speedy trial under the Sixth Amendment has been violated must fail.

### IV. Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that Andrews' "Motion to Dismiss Indictment or, Alternatively, to Dismiss United States' Notice of Intent to Seek Death Penalty as to Defendant Patrick Franklin Andrews" (Docket No. 202) be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

DATED: October 23, 2014

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE